Argued November 25, affirmed December 20, 1927, costs taxed
January 10, 1928.

# D. J. HARRIS ET AL. v. SOUTHEAST PORTLAND LUMBER COMPANY.

### (262 Pac. 243.)

**Waters and Watercourses—Riparian Owners Own Bed of Non-navigable Stream.**

1. Riparian owners of both banks of non-navigable stream are owners of bed of such stream.

**Adverse Possession—Prescription is Founded on Principle That What Primary Owner Lost by Laches Other Party Gained by Continued Possession Without Question.**

2. The doctrine of prescription is founded on the principle that what the primary owner has lost by laches other party has gained by continued possession without question of his right.

**Property—Person Who has Possession, Right of Possession, and Right of Property at Same Time is "Absolute Owner."**

3. The elements of all titles are possession, right of possession and right of property, and when such elements are all combined in one person, at one time, such person is "absolute owner" of property.

**Adverse Possession—Actual, Open, Notorious, Hostile, Exclusive and Continuous Possession is Necessary to Acquire Title by Adverse Possession.**

4. To constitute title by adverse possession, possession must be actual, open and notorious, and must be hostile, exclusive and continuous during entire time required by statute of limitation.

**Waters and Watercourses—Mere Flooding of Lands is not "Possession" Which will Ripen into Title to Land.**

5. An easement in lands by prescription may be acquired by construction and maintenance of dam across a stream, thereby causing land to be continuously submerged for statutory period; but mere flooding of lands, however long continued, is not "possession," which will ripen into title to land.

---

1. See 27 R. C. L. 1371.
4. What essential to adverse possession, see notes in 23 Am. St. Rep. 158; 88 Am. St. Rep. 701. See, also, 1 R. C. L. 685. Hostility as essential element of adverse possession, see note in 15 L. R. A. (N. S.) 1192. See, also, 1 R. C. L. 703. Unbroken continuity as essential element of adverse possession, see note in 15 L. R. A. (N. S.) 1202. See, also, 1 R. C. L. 704.
5. Acquisition of easements by adverse possession, see note in 11 Am. Dec. 663. See, also, 9 R. C. L. 771.

Waters and Watercourses—Right to Overflow Land may be Acquired by Adverse Enjoyment for Period of Time Limited by Statute of Limitations.

6. Right to overflow land, like other easements, may be acquired by peaceable, uninterrupted and adverse enjoyment of right for period of time limited by statute of limitations for right of entry on land.

Adverse Possession—Title by Prescription to Corporeal or Incorporeal Hereditament may be Acquired by Uninterrupted Enjoyment for Period of Statute.

7. Generally title by prescription to corporeal or incorporeal hereditament may be acquired by uninterrupted enjoyment for period limited by statute for right of entry on land.

Waters and Watercourses—Riparian Owner may Insist That Nonnagivable Stream shall Flow in Usual Quantity at Natural Place.

8. In absence of grant, license or prescription, limiting his rights, riparian owner on non-navigable stream may insist that stream shall flow in usual quantity at its natural place and height, and such right will not be suspended or destroyed by mere nonuser, although it may be extinguished by long-continued adverse enjoyment of others.

Waters and Watercourses—To Acquire Right to Flood Lands of Upper Riparian Owner by Use of Dam, Use must have Been Peaceable, Open, Uninterrupted and Adverse.

9. Before riparian owner can acquire right to flood lands of upper riparian owner by continuous use for 10 years of dam, possession and use of dam must have been peaceable, open, and uninterrupted, and it must also have been adverse during full period of 10 years.

Waters and Watercourses—Burden of Proving Prescriptive Right to Flood Lands Rests on Party Asserting It; and Inference or Presumption is Insufficient.

10. Burden of proving acquisition of right to flood lands of upper riparian owner by adverse possession during full period of 10 years rests with party asserting right, and cannot be established by inference or presumption.

Waters and Watercourses—Defendant Held not to have Established Prescriptive Right to Overflow Upper Riparian Lands of Plaintiff by Construction of Mill-dam Prior Use Having Been Intermittent.

11. Defendant lumber company *held* not to have established its right by prescription to overflow lands of plaintiff upper riparian

---

8. See 27 R. C. L. 1091.

9. Measure of prescriptive right of flowage of lands by maintenance of dam, see note in 11 **Ann. Cas.** 217. See, also, 27 R. C. L. 1297.

10. See 9 R. C. L. 981.

11. Necessity and requisites of continuity of adverse possession, see note in 13 **Am. Dec.** 185. See, also, 1 R. C. L. 716.

owners by mill-dam, because of existence of an old dam, where use of such old dam was intermittent, and rarely overflowed plaintiffs' land.

Adverse Possession, 2 C. J., p. 50, n. 7, p. 71, n. 2, p. 79, n. 1, p. 80, n. 8, p. 82, n. 9, 10, 11, 12, 13, 14, 15, p. 262, n. 66, p. 263, n. 67, p. 276, n. 59.
Appeal and Error, 4 C. J., p. 898, n. 92.
Easements, 19 C. J., p. 874, n. 80, 81, p. 958, n. 40, p. 964, n. 33.
Property, 32 Cyc., p. 679, n. 33.
Waters, 40 Cyc., p. 560, n. 47, 48, p. 561, n. 50, p. 566, n. 2; p. 568, n. 26, p. 569, n. 27, p. 572, n. 49, p. 620, n. 69, p. 676, n. 75, 76, p. 677, n. 81, 83, p. 689, n. 95, p. 690, n. 1.

.From Multnomah: LOUIS P. HEWITT, Judge.

Department 1.

[AFFIRMED.   COSTS TAXED.

For appellant there was a brief over the name of *Messrs. Clark, Skulason & Clark,* with an oral argument by *Mr. B. G. Skulason.*

For respondents there was a brief over the name of *Messrs. McCamant & Thompson,* with an oral argument by *Mr. W. Lair Thompson.*

RAND, C. J.—This is a suit to enjoin the defendant from maintaining a dam in Johnson Creek, a small perennial stream flowing westerly from the Cascade Mountains and emptying into the Willamette River just below Milwaukie. During freshets from heavy rains or melting snows, it sometimes carries a large quantity of water but during the summer months it carries but a small quantity. In its course it flows over the separately owned premises of the plaintiffs in a channel from six to eight feet deep and below them it flows over defendant's premises where the dam in controversy is maintained by defendant in connection with its sawmill.

1. The plaintiff Harris owns and resides upon a tract of land of about 22 acres in extent, and below and adjoining this tract the plaintiff Bowles owns another tract of about the same area. Both tracts are riparian to Johnson Creek on both banks thereof and, as the stream is non-navigable, plaintiffs are the owners of the bed of the stream where it crosses their respective premises. Harris acquired his land in 1906 and the Bowles tract was acquired by plaintiff Bowles and her deceased husband during the year 1921. A part, if not all, of said tracts, as well as defendant's mill, is within the corporate limits of the City of Portland. The Bowles tract is very highly improved and during the summer months is occupied by Mrs. Bowles as a summer home. The Harris tract is not so highly improved but is very valuable for residential purposes. A considerable part of each of said tracts drains naturally into Johnson Creek and both of them are above defendant's mill and are situate from a quarter to a half mile therefrom.

The dam complained of was constructed by the defendant in 1924 and as it has since been operated it causes the water of the stream to flow back upon the premises of both of the plaintiffs and increases the depth of the water in said stream about four feet above what it would be if permitted to flow in its natural condition. This has resulted in making the stream stagnant upon plaintiffs' said premises and in causing the channel thereof to fill up with silt and other debris and, during the summer months, this stagnant water becomes foul and gives off offensive odors which are perceptible to quite a distance from the stream. It has also caused the banks of the stream on plaintiffs' premises to cave in and to be washed away during freshets and has caused many

trees from six inches to two feet in diameter, growing along the banks of the stream, to die, some of which were at least 50 years of age, and many other trees will die if the dam is operated as now constructed. It has also caused drains upon both of said tracts, the outlets of which were in the banks of the stream and, when constructed, were about two feet above the surface of the water, to be now covered at a depth of several feet which has rendered the same unserviceable. It also appears that since 1924 it has caused water to rise in the basement of the Bowles home of a sufficient depth at times to prevent the use of the furnace for heating purposes, all of which has resulted in serious damage to the property of both of the plaintiffs.

Defendant claims a right by prescription to maintain the dam and to raise the water of the stream and back the same upon plaintiffs' premises, and bases this alleged right upon an old dam which was constructed at substantially the same place in 1903. Before discussing the evidence offered upon this point, it will be of assistance to first consider the law applicable to cases of this kind and to the character of proof required to establish a right by prescription.

2, 3. The doctrine of prescription is founded upon the principle that "what the primary owner has lost by his laches, the other party has gained by continued possession without question of his right": *Campbell* v. *Holt,* 115 U. S. 620 (29 L. Ed. 483, 6 Sup. Ct. Rep. 209). Possession has always been a means of acquiring title to property. The elements of all titles are possession, the right of possession and the right of property, and when these elements are all combined in one person at one time, such person is the absolute owner of the property. Adverse possession

has a well-defined legal definition and every element in the definition of adverse possession must exist, otherwise the possession will not confer title: *Croft* v. *Weakland,* 34 Pa. 304.

4. The elements contained in the legal definition of adverse possession and which, to constitute a title by adverse possession, must exist are that the possession must be actual, open and notorious and must be hostile, exclusive and continuous during the entire time required by the statute of limitations. As said by Mr. Chief Justice BEAN in *McNear* v. *Guistin,* 50 Or. 377 (92 Pac. 1075):

"There is no particular manner by which such possession may be indicated or made manifest, and no particular act or series of acts are required to be done on the land. There must, however, be actual use and occupancy, continuous for the necessary length of time, of such an unequivocal character as will indicate to the owner an assertion of an exclusive appropriation and ownership. In short, the acts of the alleged occupant must be so open and exclusive as to leave no inquiry as to his intention, so notorious that the owner may be presumed to have knowledge that the occupancy is adverse, and so continuous as to have furnished a cause of action every day during the required period."

"In order to perfect title by adverse possession, such possession must be continuous for the whole period prescribed by the statute of limitations; any break or interruption of the continuity of the possession will be fatal to the claim of the party setting up title by adverse possession; and the length of time a break or interruption in the possession exists is immaterial. Continuity is the very essence of the doctrine and policy of the statute of limitations. It has been said that if there be one element more distinctly material than another in conferring title by adverse possession, where all requisites are so, it is the ex-

istence of a continuous adverse possession. There must be such continuity of possession as will furnish a cause of action for every day during the whole period required to perfect title by adverse possession; and the possession must be more than a possession which will enable a person, on the ground of possessory title, to maintain trespass or ejectment against a stranger. Hence occasional trespasses or acts of ownership do not constitute such continuous possession as will ripen into a title by adverse possession, although extending over the statutory period." 2 C. J., pp. 80–82.

5–7. An easement in lands by prescription may be acquired by the construction and maintenance of a dam across a stream, thereby causing the land to be continuously submerged for the statutory period, but the mere flooding of lands, however long continued, is not a possession which will ripen into title to the land: 2 C. J., p. 71, and note 2a. The right to overflow land, like other easements, may be acquired by a peaceable, uninterrupted and adverse enjoyment of the right for the period of time limited by the statute of limitations for the right of entry upon land. The statute, however, "does not begin to run until there has been an actionable invasion or infringement of a right, although it is not necessary that actual damages should have been suffered": Angell on Watercourses (7 ed.), § 219c. Mr. Gould, however, in his work on Waters (3 ed.), Section 210, says: "The period of limitation does not begin to run until actual injury is suffered." In *Oregon Construction Co.* v. *Allen Ditch Co.*, 41 Or. 209 (69 Pac. 455, 93 Am. St. Rep. 701), it was held that:

" * * the acquirement of a prescriptive right has come to be measured by the statute of limitations for the recovery of real property, and such is the rule in

this state: Kinney, Irr., § 295; *Dodge* v. *Marden,* 7 Or. 456. * * The adverse holding of land and of an easement constituting the use of water are exactly parallel, so far as the similarity of the property will admit of it.''

In this country it is very generally held that a title by prescription to a corporeal or incorporeal heredita-ment may be acquired by an uninterrupted enjoy-ment for the period limited by statute for the right of entry upon land, and that it is the policy of the law to limit the presumption of a grant to periods analogous to those of the statute of limitations in cases where such statutes do not directly apply, and that there is no difference in the doctrine whether the grant relates to corporeal or incorporeal heredita-ments: Angell on Watercourses (7 ed.), §§ 204–209. In *Weiss* v. *Oregon Iron & Steel Co.,* 13 Or. 496 (11 Pac. 255), this court, speaking through Mr. Justice Lord, said:

''Riparian proprietors are entitled, in the absence of grant, license, or prescription limiting their rights, to have the stream which washes their lands flow as it is wont by nature, without material diminution or alteration. * * The general principle is, that every owner of land through which a natural stream of water flows has a usufruct in the stream as it passes along, and has an equal right with those above and below him to the natural flow of the water in its accustomed channel, without unreasonable detention or substantial diminution in quantity or quality, and none can make any use of it prejudicial to the other owners, unless he has acquired a right to do so by license, grant, or prescription.''

8. The rights claimed in this suit are purely ripa-rian in their nature and, as such, each proprietor, in the absence of grant, license or prescription limiting

his rights, may insist that the stream shall flow to his land in the usual quantity, at its natural place and height, and that it shall flow off his land to his neighbor below in its accustomed place and at its usual level, and this right is a right of property inseparably annexed to the soil itself and exists *jure naturae* as parcel of the land, which right will not be suspended or destroyed by mere nonuser, although it may be extinguished by the long continued adverse enjoyment of others: Gould on Waters (3 ed.), § 204. The evidence of a right by prescription "ought always to be clear and conclusive." *MacRae* v. *Small,* 48 Or. 139 (85 Pac. 503). It should always be remembered that the law favors the true owner and requires strict proof of an intent to claim his property adversely before an adverse claim can be sustained: *Bradtl* v. *Sharkey,* 58 Or. 153 (113 Pac. 653). See, also, *McNear* v. *Guistin, supra.* "Evidence of adverse possession is always to be construed strictly, and every presumption is to be made in favor of the true owner. The burden of establishing it is upon him who asserts it, and it is not to be made out by inference or presumption, but by clear and positive proof: *Kurtz* v. *Miller,* 89 Wis. 426 (62 N. W. 182)." "It is incumbent on one who relies upon an adverse possession to extinguish the legal title, to establish the necessary facts by clear and satisfactory evidence. All presumptions are in favor of the legal holder, and the burden of overcoming them rests with him who assails the legal title: *Evans* v. *Welsh,* 29 Colo. 355 (68 Pac. 776)." "The burden of proving all the essential elements of an adverse possession, including its hostile character, is upon the party relying upon it: *De Freize* v. *Quint,* 74 Cal. 653 (30 Pac.

1, 28 Am. St. Rep. 151)." The above quotations are from 1 Ency. of Evidence, p. 643, note.

9, 10. Under the authorities cited, the right of one riparian owner on a stream to flood the lands of an upper riparian owner may be acquired by the continuous use for 10 years of a dam which raises the water of the stream and causes it to flow upon and to flood such lands, but before it can have that effect the possession and use of the dam must have been peaceable, open and uninterrupted and it must also have been adverse, that is, it must have been commenced and continued in a manner which indicated a claim of right, and these elements of adverse possession must have existed and continued during the full period of 10 years and the burden of proving that they did exist and continue for such period rests with the party asserting the right and cannot be established by inference or presumption.

The evidence shows that some time in the year 1903, but neither the month nor the date thereof is shown, J. H. Meyer, one of defendant's grantors and predecessors in interest, built a small sawmill and dam upon the premises now owned by the defendant. The mill had a capacity of sawing 2,500 to 3,000 feet of lumber per day and the dam was built at substantially the place of defendant's present dam. The dam was constructed by Mr. Meyer with a concrete base in the bottom of the stream with uprights and flash boards and was used to raise the water for a mill-pond for floating logs. The evidence shows that Meyer operated the mill and dam for some two or three years and then sold and conveyed the same to one E. J. Finn, who, about three months thereafter, sold and conveyed the same to Cone Brothers. Finn did not operate the mill. Cone Brothers operated it

off and on until about 1908, at which time it went into possession of the Miller-Mowrey Lumber Company, who operated the same until some time in 1913 and then closed down all operations so far as the mill-pond and dam were concerned and the mill remained shut down until some time in 1917, when it was again operated until June, 1918, at which time the mill was burned. In 1924, this defendant acquired title to the property and erected a large modern sawmill and new dam. The present mill employs about 70 men. Mr. Meyer was called as a witness for the defendant and he testified that the mill was operated off and on from the time of its construction until it burned down in June, 1918, and that the mill was often shut down because of unfavorable market prices for the lumber, and that during the time it was so shut down the flash-boards were removed and the water permitted to pass down the stream without let or hindrance from the dam. All of the evidence shows that from the time when the mill was burned in 1918 until 1924, when the new mill and the new dam were built, all of the water of the stream passed the old dam site without being obstructed in any manner whatever. Defendant called Mr. A. M. Mowrey, who was connected with the Miller-Mowrey Lumber Company, and on his direct examination he testified that he was connected with the mill from April, 1914, until July 2, 1917, and on his cross-examination he testified:

" * * At the time that I went up the creek fishing the dam wasn't shut, either, altogether. Q. Oh, it wasn't shut altogether? A. No. Q. What was the occasion for opening it? A. Well, at the time we had taken the flash plank out on account of the winter freshet; we never put it in, because right at that time we were not running the mill. We were just running that retail. Q. How long was the mill shut down at

that time? A. It was shut down for a couple of years. Q. What is that? A. It was shut down for a couple of years. Q. You would say it was shut down during the years '15 and '16? A. I think it was. Q. Didn't operate at all? A. Just '15 and '16 it was shut down; just lumber, that is all; retail yard. Q. Was it shut down during the year '17? A. Well, part of the time; then we leased it to Price & Conn, and they started to—they had the mill in July, I guess, and that burned down in 1918. Q. Was the mill shut down during 1914? A. Yes, it was. Q. And during 1915? A. Yes. Q. During the years 1914, '15, '16 and '17 the mill was shut down? A. Not all of '17, no. Q. Oh, I beg pardon, sir. What time of '17 was it started? A. We started in August repairing it in July; they leased the mill along the 15th of July. Q. Then during the three years, '14, '15 and '16, and the first half, at least, of the year '17, the mill was shut down? A. Yes. Q. They were making no use whatever of any water of Johnson Creek at the mill? A. No. Q. Were you familiar with the mill prior to the year 1914? A. No, not to know that it was run there, for I wasn't working for the company. Q. Were you ever out there prior to the time you went out as you say and began working at the mill in '14? A. Before that time? Oh, yes; I was out there several times before that time. Q. Was it shut down in one of those years prior to '14? A. Part of the time. Q. About how much time was it running and how much not running? A. Well, I don't know just exactly what year it wasn't run, as far as that goes; that is farther back than I have paid any attention to it. Q. Well, as a matter of fact, the mill didn't run continuously during any of your acquaintance with it, did it? It would run for a while and then shut down for a while; isn't that the truth? A. I guess it run continuously there after father had bought it for a number of years, and then they shut down on account of the lumber conditions were such that they couldn't afford to run it. Q.

Now, I am just referring to what you know. I want to know whether you don't know it to be a fact that prior to the year 1914— A. (Interrupting.) No, I don't know to be a fact how steady it run. Q. You don't know whether it run steadily or not? A. No. Q. You do know, however, it was shut down a part of the time prior to 1914? A. Yes. * * Q. The mill didn't hold logs there when they were not operating, did they? A. No. They had a few old logs in there. I remember at one time we closed the dam and floated them out so the fellows could get them, get them out. Q. Aside from closing the dam for purposes of that kind, you had the dam open and the mill wasn't operating? A. Yes. * * Q. Occasionally in the summer time they would put in a board or two to make it deep enough for kids to go in. Outside of that, in the summer time when there was no need for it, you didn't hold the water up? A. No.''

The only evidence offered by the defendant in respect to the operation of the mill and of the dam from the time the mill and dam were constructed in 1903 up to the time the mill burned in 1918 is that of Mr. Meyer and Mr. Mowrey, to which we have referred, with the exception of the testimony of A. J. Dwyer, president and general manager of the defendant company, and the only testimony he gave in respect to the same was his general statement that he delivered logs to the old mill in 1912 and 1913 and again in 1917 and 1918, and that the old dam was of the same height as the new dam. The plaintiff D. J. Harris testified that he purchased his property in April, 1906, and constructed a house thereon and went there to live in July, 1906, and that he had been there ever since; that at the time he purchased the property there was probably three or four feet of water in the channel of the stream on his place and he asked a neighbor what caused it to back up and he

123 Or.—36

was informed that there was a little pond down the stream where there was a small mill and that during the time the mill was in operation the water was about three feet deep on his place at a point he was then describing. He testified that in the fall of 1914 he commenced the construction of a drainage system and finished it in the spring of 1915; that the drain had its outlet in Johnson Creek and that at the time the old mill was in operation the outlet of the drain was from a foot to eighteen inches above the surface of the water and, that since 1924 after the construction of the new dam, the outlet is now covered with water which has compelled him to dig a well and install and operate a pump to drain his premises. He also testified that from the time he completed his drainage system up until 1924, when the new dam was built, it always worked except at times when there was a freshet in the creek.

11. Neither the testimony offered by the defendant nor the admissions of the plaintiff Harris, or both combined, are sufficient to establish an easement upon the part of the defendant to pond the water in the channel upon the premises of the plaintiffs. That there was at times by means of the old dam the flowing back of the waters in the channel of the stream clearly appears from the testimony, but there is no testimony to show that this flowing back of the water was continuous or that it continued at any time during the full period of ten years and the evidence clearly shows that the use now made of the channel of the stream by the new dam is a new use and raises the water much higher than it was raised by the old dam, and the burden of proving a prescriptive right rested with the defendant. There is an entire lack of any proof sufficient to establish such right and,

since the use which defendant is now making of the channel of the stream results in an actual injury and damage to the plaintiffs and is a clear infringement of their rights, they are entitled to injunctive relief. The decree of the lower court enjoined the defendant from maintaining its dam and that court, at the request of the parties, made a personal examination of the premises and had the benefit of hearing the testimony and of having the opportunity of observing the manner and demeanor of the witnesses. We think its decision was correct, and for the reasons stated, the decree will be affirmed. AFFIRMED. . COSTS TAXED.

COSHOW, MCBRIDE and BEAN, JJ., concur.