Argued May 1, reversed and remanded November 10, 1972

ARRIEN, *Respondent, v.* LEVANGER, *Appellant.*

502 P2d 573

*William D. Cramer,* Burns, argued the cause for appellant. ▮▮▮▮▮▮▮▮▮

*H. Clifford Looney,* Vale, argued the cause for respondent. ▮▮▮▮▮▮▮▮▮

O'CONNELL, C.J.

This is a suit to enjoin defendant from trespassing upon plaintiff's land by the seasonal flooding of his land, and to recover damages for the alleged trespass. As an affirmative defense, defendant claims a prescriptive easement to flood plaintiff's land. The trial court granted the relief sought by plaintiff. Defendant appeals. The only issue on appeal is whether defendant acquired a prescriptive right to flood plaintiff's land.

In 1948, defendant's predecessor in interest erected a dam on his land creating what is known as Easterday Reservoir.[①] The reservoir is used to store water

---

[①] Defendant has a permit issued by the office of the State Engineer to store 1043.7 acre feet of water in the Easterday Reservoir. The storage of this amount of water does not back up the water upon plaintiff's land.

which flows into it during spring when the rain and the snow pack from the adjacent watershed produce a runoff. The damages claimed by plaintiff resulted when the waters impounded by the reservoir backed up onto plaintiff's contiguous upland and destroyed his crested wheatgrass crop.

It is defendant's position that the inundation of a part of plaintiff's land from 1948 to 1970 gave him a prescriptive easement in plaintiff's land. The trial court held that the interference with plaintiff's land did not meet the requirement of continuity of use necessary to establish a prescriptive right, and that even assuming continuity of use was established, there was no evidence to prove that defendant's use was under "color of title" or "claim of right."

On appeal, plaintiff asserts in support of his position these two grounds relied upon by the trial court. In addition, he contends that the defendant's adverse claim must fail on the ground that defendant did not establish with sufficient definiteness the area claimed to be subject to the easement. We shall consider the last contention first.

The evidence established that the reservoir usually started to collect the runoff in February and the waters so collected were impounded until they were used during the irrigation period, which usually lasted until the end of April. Over the years there were variations in the extent to which the water spread over plaintiff's land, depending upon the amount of runoff for the particular year. One of plaintiff's witnesses testified that in terms of available water for irrigation during a 10-year period, about one third of the years were "very good" or "wet" years, one third "moderate" or "fair" years, and one third were "dry" years. He

also testified that during the "wet" years the impoundment of the water would cause plaintiff's land to be flooded. Likewise, in "fair" years plaintiff's land would be flooded, but to a lesser extent.

One of defendant's witnesses testified that four out of five years could be characterized as fair years and that in those years the water would "get on him [plaintiff] but won't get clear over him." The defendant and his son testified to the same effect and noted that the dam had "spilled" three times since it had been built. The district watermaster indicated that in 1965 the defendant told him that the dam had spilled in 1951, 1958 and 1962.

Other evidence establishing the existence and extent of the flooding of plaintiff's land included the testimony of Walter Gillespie, the County Surveyor, who interpreted a stadia survey map which he had made in September, 1965. The map showed the area of land covered by the reservoir when various amounts of water were backed up by the dam. Gillespie correlated the water elevations at the dam with the contour lines on his stadia survey map. Upon the basis of the evidence elicited from Gillespie it appears that during the "wet" years the reservoir would encroach upon the plaintiff's land up to the 97.5 contour line drawn on the stadia survey map.

The plotted and projected contour lines on the stadia survey map were in substantial accord with aerial photo maps taken over the reservoir. By interpreting these maps, witnesses explained that it was possible to note the fluctuating course of the waters in the reservoir. These maps, made in 1954 (less than seven years after the dam's construction), showed that

water from the Easterday Reservoir had inundated the plaintiff's land in varying degrees.

■■ Plaintiff contends that the foregoing evidence does not disclose the flooding of any definite area of land over the years. We think that the evidence taken as a whole is sufficient to identify the area of land flooded from time to time during the prescriptive period. It is true that the area of land flooded was not the same each year, and in some years there was no flooding at all. But this in itself does not preclude the acquisition of an easement, any more so than in the case of other easements where the area of the servient estate fluctuates with variations in use by the dominant owner.

■ All that is necessary to meet the requirement of definiteness where there is a variation in the area invaded is that the maximum or outer limits of the interference be established. This requirement was met in the present case. The evidence established that the water reached the 97.5 contour line in "wet" years, which were approximately one third of the years during which defendant impounded water in the reservoir. This, we think, is enough.

In addition to the requirement of definiteness is the requirement of continuity. Recently, in *Hay v. Stevens*, 262 Or 193, 497 P2d 362 (1972), we had the occasion to explain and apply the requirement of continuity of use. There we turned to 5 Restatement of Property (Servitudes) § 459, *Comment b,* p. 2936 (1944), for a statement of the principle:

> "To satisfy the requirement that the use be continuous it is not necessary that it be constant. A use may be continuous though there are periods of time more or less extended between the specific acts of use. Many easements, such as rights of way

and rights of hunting or fishing, which are periodical or only occasional in use may be acquired by prescription. The requirement means that there be no break in the essential attitude of mind required for adverse use rather than that the use be constant.

In *Hay v. Stevens, supra,* we held that an easement was established to pass on foot over a pathway on the servient owner's land leading to the ocean beach even though the use was made only during the summer months and on weekends during the winter months. We also noted other Oregon cases where intermittent uses were held sufficient to satisfy the requirement of continuity.[2]

In the present case, the flooding of plaintiff's land by defendant spanned a period of over twenty years. As we have noted above, the extent of the flooding during that period was not constant. But the irrigation flooding of plaintiff's land was the normal use which an average owner of farm land requiring irrigation would make if he were the owner. Thus the use here meets the test laid down in *Springer v. Durrette et ux,* 217 Or 196, 342 P2d 132 (1959) and *Hay v. Stevens, supra,* where we held that an important consideration in testing continuity is the character of the property and the manner in which the average person would use it.

■ If, as the Restatement of Property explains, "[t]he requirement [of continuity] means that there be no break in the essential attitude of mind required for adverse use," then the requirement is clearly made out in the present case because the existence of the dam on defendant's land served as a constant warning to

---

[2] Norgard et al v. Busher et ux, 220 Or 297, 349 P2d 490, 80 ALR2d 1161 (1960); Knecht v. Spake et al, 218 Or 601, 346 P2d 98 (1959); Springer v. Durrette et ux, 217 Or 196, 342 P2d 132 (1959).

plaintiff that the flooding of his land would continue to recur in varying degrees as the runoff from the surrounding watershed collected behind defendant's dam. This recurring invasion of plaintiff's land reached a contour length of 97.5 in approximately seven out of the 22 years from 1948 to 1970, as demonstrated by the testimony that one third of the years were "wet." This, we think, was of sufficient recurrence to give plaintiff warning that defendant's claim was to the full flooding capacity of the dam.[8]

The trial court held that "even assuming that the possession here could be found to be 'continued possession' for the required ten-year period, the plaintiff (sic) has produced practically no evidence or showing that such possession was had under any 'color of title' or 'claim of right' adverse to the plaintiff as is required."

■■ The term "color of title" is properly used to describe the situation where the adverse possessor is the grantee of a deed purporting to describe the limits of the tract which he intends to possess. A possessor having color of title may acquire title by adverse possession of the land described in the deed through the actual possession of only a part.[9] Thus, it can be seen that the doctrine of color of title is not applicable to the facts of the present case.

---

[8] In Harris v. Southeast Portland Lumber Co., 123 Or 549, 555, 262 P 243 (1928), the court said: "An easement in lands by prescription may be acquired by the construction and maintenance of a dam across a stream, thereby causing the land to be continuously submerged for the statutory period, but the mere flooding of lands, however long continued, is not a possession which will ripen into title to the land."

[9] See, Note by Charles Phipps, Adverse Possession—Color of Title—Origin of Doctrine, 22 Or L Rev 188 (1943).

██ Nor can the trial court's conclusion that defendant's possession was not under "claim of right" adverse to the plaintiff be sustained. The trial court stated that: "All the evidence in the case at bar is to the effect that he [defendant] knew full well that he was trespassing on plaintiff's lands but did not feel that he was causing much harm." Whether a person who intrudes upon another's land feels that his intrusion is harmful or beneficial is immaterial in determining whether adverse possession or prescription is established. All that must be shown is that the use is "not made in subordination to those against whom it is claimed to be adverse." 5 Restatement of Property (Servitudes) § 458, *Comment d,* p. 2927 (1944).

██ In contending that the use was not adverse, plaintiff relies upon an alleged conversation with defendant which was explained by plaintiff as follows:

"Q Have you had occasion to talk to Mr. — When was that?
"A Oh, I don't know. It has been more than one time that I talked about it. A couple of years ago, two years ago.

"Q What was said at that time?
"A I said, I believe the statement at that time was that there wasn't very much flooded and that it certainly couldn't hurt anything. And, that's about the extent of it."

It is not clear from this testimony whether plaintiff or defendant made the statement concerning the harm caused to plaintiff's land. Moreover, the statement was made long after the prescriptive period had run. Plaintiff also relies upon testimony given by a third person to the effect that in 1965 defendant said that he intended to purchase land from plaintiff "due to the flooding" and that defendant wanted "to straighten

up the matter." A willingness to purchase land from the servient owner does not, in itself, negate an adverse use.[5] This would be true even if the offer to purchase was transmitted to the servient owner. There would be even less reason to infer a use in subordination to the servient owner where, as here, the offer to purchase was not transmitted to him.

There is no other evidence that defendant's use of plaintiff's land was made in subordination to plaintiff. It follows, therefore, that the trial court erred in finding that defendant's use was not adverse.

The trial court also found that defendant's use was not made under "an open claim of right." The evidence is to the contrary. From plaintiff's own testimony it is apparent that he was aware of the flooding of his land in varying degrees during the period in question.

Finally, plaintiff contends that defendant's conduct in exceeding his storage permit issued by the State Engineer constituted a public nuisance and being in violation of the law, defendant is barred from relief under the clean hands doctrine.

It is well established that a person may not acquire a prescriptive right to maintain a public nuisance. But this rule states only the rights of the prescriptive user *as against the public;* it does not purport to preclude a landowner from acquiring a prescriptive right as against his neighbor.[6]

Defendant has established all of the elements

---

[5] Cannon v. Stockmon, 36 Cal 535 (1869); Zell v. First Universalist Society, 119 Pa 390, 13 A 447 (1888); Clithero v. Fenner, 122 Wis 356, 99 NW 1027 (1904); 1 Am Jur § 184, p. 893 (1936).

[6] Charnley v. Shawano Water-Power & River Imp. Co., 109 Wis 563, 85 NW 507 (1901).

necessary to acquire a prescriptive right to flood plaintiff's lands up to the 97.5 contour. Therefore, the decree of the trial court is reversed and the cause is remanded to enter a decree consistent with this opinion.

McALLISTER, J., specially concurring.

This suit involves a claim of a prescriptive easement to periodically flood plaintiff's land. According to the majority opinion the test of the continuity of use is whether "the irrigation flooding of plaintiff's land was the normal use which an average owner of farm land requiring irrigation would make if he were the owner." As authority for this test it cites *Springer v. Durrette*, 217 Or 196, 342 P2d 132 (1959) and *Hay v. Stevens*, 262 Or 193, 497 P2d 362 (1972).

*Springer* involved a claim of title by adverse possession. The adverse possessor used the land for grazing only a part of each year; the rest of the year the land was subject to floods. The court held that under the circumstances the requirements of actual physical possession and of continuity were met, citing 6 Powell on Real Property § 1018 and 3 American Law of Property § 15.3, to the effect that the claimant need only show that he has used the land in question in the way in which an average owner would have used it. The authorities cited deal with the acquisition of title by adverse possession, which was the issue in *Springer*.

The test of the claimant's use in terms of the use which an average owner would make of the land is commonly employed in cases involving claims of title by adverse possession. *Grimstad v. Dordan*, 256 Or 135, 141, 471 P2d 778 (1970); *Fry v. Woodward*, 221 Or 39, 43-44, 350 P2d 183 (1960); *Norgard v. Busher*, 220 Or 297, 304, 349 P2d 490, 80 ALR2d 1161 (1960).

In those cases the test seems to be employed in connection with the requirements that the adverse use be open, continuous and exclusive, as a way of emphasizing that those requirements must be met only insofar as appropriate, taking into consideration the nature of the land and the uses for which it is suited.

Where, however, a claim of easement by prescription rather than a claim of title is involved, the traditional test of continuity of use has been related to the nature of the use and the needs of the claimant, rather than to the nature of the land. The following is from 2 American Law of Property 270, § 8.57:

> "For a use to be continuous there must be no cessation of use. Many uses are discontinuous in their nature, as in most cases of ways. But a use discontinuous in nature may yet be continuous as that term is used in the law of prescription. The essential fact is that the *use be made as occasion may demand* without a break in the attitude of non-subordination that marks an adverse use." (Emphasis added.)

This approach was adopted in *Feldman v. Knapp,* 196 Or 453, 473, 250 P2d 92 (1952):

> "To establish continuity of user for the statutory period of ten years, it is not necessary to show such use on each day throughout the period. It is necessary only to show that the claimant made *such reasonable use of the way as his needs required.* * * *" (Emphasis added.)

The opinion in *Feldman* then quotes from 28 CJS Easements 649, § 13b, and from 17 Am Jur 972, Easements § 60, to the same effect.

However, in *Hay v. Stevens,* supra, the "average owner" test was applied in a prescriptive easement

case. The easements involved were footpaths which, because the dominant estates were occupied only part of the time, were used only intermittently. The traditional test in prescriptive easement cases, focusing on the claimant's needs and the nature of the use, would have produced the same result in that case. In my view the "average owner test" was improperly substituted for the traditional prescriptive easement test in *Hay v. Stevens*. Similarly, in the present case, the traditional prescriptive easement test would justify finding an easement by prescription regardless of what use the average owner would make of his land. I think the "average owner test" is not applicable in this case.