Argued October 11, 1978, affirmed April 24,
petition for rehearing denied May 22, 1979

THOMPSON, et ux, *Appellants,*

*v.*

SCHUH, et ux, *Respondents.*

(No. TC 20846, SC 25574)

593 P2d 1138

Bert E. Joachims, of Klosterman & Joachims, Portland, argued the cause and filed a brief for appellants.

Harold L. Olsen, of Vagt, Olsen & Coon, St. Helens, argued the cause and filed a brief for respondents.

Before Denecke, Chief Justice, and Holman, Howell and Lent, Justices.

LENT, J.

**LENT, J.**

Plaintiffs (Thompson) appeal from a decree by the trial court declaring that they have no rights to use a roadway located on defendants' (Schuh) land. This is a suit in equity with two counts, the first seeking a declaration that plaintiffs acquired by prescription an easement in common with defendants for ingress and egress to their Columbia County property. The second count, also seeking a declaration that plaintiffs be allowed to use the road, alleges an easement by implication and/or necessity.

■■ In this case for declaratory relief held before the trial judge without a jury, we try the facts anew upon the record. ORS 19.125(3). This court has held in other equity cases involving prescriptive and implied easements the burden is on the plaintiff to establish his case by clear and convincing evidence. *Thompson v. Scott*, 270 Or 542, 546-547, 528 P2d 509 (1974); *Cheney v. Mueller*, 259 Or 108, 124, 485 P2d 1218 (1971).

The properties primarily involved in this case are in the Southwest Quarter of Section 12, Township 6 North, Range 3 West, Willamette Meridian (hereinafter SW 1/4). At the time this suit was brought plaintiffs Thompson owned the SE 1/4 (a "short quarter," with only 38 acres) of the SW 1/4. Defendants Schuh owned 80 acres, the N 1/2 of the SW 1/4 , and persons named Hallberg owned the remaining SW 1/4 of the SW 1/4. Neither the Schuhs nor Thompsons had lived on their land.

As of 1953 both the Thompson property and the Schuh property was owned by one, Gregory, who had bought the land in 1952. In early 1953 Gregory sold what was to become the Schuh property to the Warrens. The property apparently changed hands twice again before Schuh acquired ownership in 1965. In 1956 Gregory sold the SE 1/4 of the SW 1/4 to Thompson. In 1961, Thompson conveyed his property to his father-in-law but took it back one and a half

years later. Mr. Thompson's testimony was that the transaction was without consideration and was for the purpose of putting the property out of the reach of creditors.

The Schuh Road is an extension of a county road named Crosby Road which runs south-north on the western boundary of the Hallberg property (the SW 1/4, SW 1/4). The county road ends at the southwest corner of the Schuh property, where the Schuh Road begins. The Schuh Road turns easterly, running through the southern half of the NW 1/4, SW 1/4. About two-thirds through the NW 1/4, SW 1/4 there is a clearing which the Schuhs have kept mowed and on which is a shelter and picnic tables. From the Crosby Road to the clearing the road has been "rocked" by Schuh. Schuh described the road as 10 feet wide, with steep banks on both sides. At one point Thompson described the road as a one-lane road, with turnouts, and estimated the width at 24 to 30 feet, and at another point he described it as "narrow." From the clearing the road angles southeasterly, without entering the Schuh NE 1/4, SW 1/4, until it runs into the northwest corner of the Thompson SE 1/4, SW 1/4. This part of the road has not been maintained by Schuh, except that in 1967 or 1968 he cleaned it out to the Thompson property line.

The origin of the roadway (Schuh Road) which is the contested easement of this suit is unclear. It may have come into existence in the early 1950's.[1] One of defendants' exhibits shows that from the Thompson property line the road or trail runs to the south and

---

[1] It is actually not clear that this road, at least the section from the clearing to the northwest corner of the "short quarter," was in existence before 1960. An aerial photo, which plaintiffs said was taken in 1950 but on which is the date 10-1-54, was introduced into evidence by plaintiffs to show the area and roads. A road is clearly shown running through the Schuh land, into and through the Thompson land. Up to the present clearing it is the same road at issue here, but from there it seems to continue north and east into the Schuh NE 1/4, SW 1/4, where it then angles southeast until it enters the Thompson property east of where the road in contention enters.

then east, across a creek, through the Thompson "short quarter," on to the east through the SW 1/4, SE 1/4, Section 12, owned by Thompson and purchased from one Van Natta, in 1959, and on into the SE 1/4, SE 1/4, Section 12, partially owned by Thompson and also bought in 1959. In that Thompson owned property the jeep trail turns north until it runs into the "Schumacher Road," a county-maintained road, on the property line in the northwest corner of the SE 1/4, SE 1/4.[2] The distance from the creek to Schumacher Road was estimated to be a little more than one-quarter mile. This road or jeep trail running from the creek to Schumacher Road had been used as a logging road and is about 10 feet wide.

The Thompson property extends to the south and east. Just south of the property purchased by Thompson in 1959 is the N 1/2, NE 1/4, Section 13, also purchased by Thompson from Gregory in 1956. In the NE 1/4, NE 1/4, Section 13, purchased in 1956 just south of the Thompson owned property in the SE 1/4, SE 1/4, Section 12, is access to a public road via the east spur of the Clark and Wilson railroad grade deeded to the county for road purposes.

Thompson testified that he used the "short quarter" since its purchase in 1956 for timber harvesting. This use required, according to Thompson, that the land be inspected four to six times a year. In the summer and fall of 1960 plaintiffs logged their "short quarter" and in doing so used the contested easement for moving in

---

[2] This property partially owned by Thompson and the access to the county-maintained road is shown in the upper left-hand corner of a diagram used in *Thompson v. Scott*, 270 Or 542, 545, 528 P2d 509 (1974), a case involving the same plaintiffs and a witness who testified on behalf of defendants in the present case. For some unknown reason neither party in the case at hand brought the previous case to the trial court's or this court's attention, though the case was decided two and one-half years before this trial was held. The principles of prescriptive easements discussed in that case are clearly applicable here. For yet another easement case involving local property owners, though not directly bordering this property, see *Van Natta v. Nys and Erickson, et al*, 203 Or 204, 278 P2d 163, 279 P2d 657 (1954).

equipment and hauling out logs. Thompson testified that a caterpillar was used to clear out parts of the road then.

■ Plaintiffs' first assignment of error is that the trial court erred in finding that plaintiffs' use of the Schuh Road was not proven to have been an adverse use over the requisite prescriptive period of ten years. The elements required for establishing a prescriptive easement were stated by this court in *Thompson v. Scott*, 270 Or at 546:

> "In order to establish an easement of way by prescription the plaintiffs must establish an open and notorious use of defendants' land adverse to the rights of defendants for a continuous and uninterrupted period of 10 years."

The trial judge here determined that the period of use was insufficient in two respects, that the sale in 1961 to avoid creditors broke the chain of years and that the evidence preponderated in favor of Schuh's testimony that he erected a gate when he obtained the property in 1965. The transfer in 1961 to avoid creditors, however, does not necessarily break the chain of years. The key to obtaining an easement by prescription is possession and use, which plaintiff claims he maintained during that one and a half year period.

As did the trial judge, we will use as the first possible starting point of the prescriptive period the sale to Thompson in 1956, since there was no evidence of use of the Schuh Road by Gregory before then. For the latest possible cessation of the claimed prescriptive period, we will use 1975 when plaintiff admitted he was blocked by a gate on the Schuh Road, though he also testified he was blocked in 1971 by a gate on the Hallberg property. The first adequately proven use of the road, though, occurred in 1960 when Thompson logged the "short quarter" for most of the summer and fall. As for other use of the road, Thompson testified on direct examination that he used the road to inspect

the property, "Just periodic, several times a year just to make sure the timber was still there." The following testimony occurred in his cross-examination:

"Q  Now you said that from 1956 until 1973 you made periodic trips out to your property using the road that crosses Mr. Schuh's property; correct?

"A  Yes.

"Q  But these were mostly inspection trips?

"A  Yes.

"Q  I gather from that then you were not doing any active work on your parcel of land then; were you?

"A  I didn't do any or have any done except in 1960. The other trips were inspection trips.

"Q  How many times a week or a month would you make an inspection trip across this property?

"A  Just several times a year when I had time.

"Q  By 'several times a year' what do you mean?

"A  Several times during the summer, and a few times during the winter.

"Q  Would you say during the course of a year that you would go out there four times, all total?

"A  Four to six times.

"Q  Now when you went out there what kind of a vehicle did you travel in?

"A  We usually used my pickup.

"Q  You say 'we'.

"A  Well, whoever happened to be with me, but I would have normally used my pickup, my work pickup.

"Q  And when you drove your work pickup out there, how far would you drive it along the road that crosses Mr. Schuh's land?

"A  Sometimes just to the clearing, and I have drove it clear down to my property.

"Q  When was the last time you drove it all the way down to your property?

"A  I think—well, we went down in '73. I think '74 or '75 is the last time I have been clear down to my property.

"Q  And prior to that when was the last time, as best you can recall.

"A   I would say it was '69, I think, was the other time prior to that that we hadn't turned around at the landing.

"Q   Most of the time you turned around in that clearing; did you not?

"A   Yes. If it was wintertime, we did, definitely."

In addition to this lack of specificity as to frequency and actual use of the road,[3] several other factors suggest a lack of continuity in use of the road. First of all, it isn't clear that Thompson could travel on the Schuh Road to his property for a continuous 10-year period. Not only did he acknowledge that most of the time he turned around in the clearing, but there was also evidence that the road became impassable in the early 1960's after the Columbus Day storm of 1962.[4] A local property owner named Scott, apparently the defendant in *Thompson v. Scott, supra*, testified that he could not get through the Schuh Road with a bulldozer in the winter of 1964-65 because of fallen trees. Schuh testified that when he bought the land in 1965 he "chain sawed up an awful lot of stuff" on the roadway.

In addition to these natural barriers strongly suggesting a lack of continuity of use, there was also testimony that Schuh and Hallberg erected gates on the roads preventing traffic on them. Schuh testified that he erected a locked chained gate across his road near the entrance to his land soon after he obtained the property in 1965, and he presented pictures allegedly from that time showing the gate. Wooden gates were put up sometime between 1969 and 1971, but they disappeared in 1974 and the chain gate was used again. Thompson testified that a gate was put up

---

[3] This court stated in *Thompson v. Scott*, 270 Or at 548:

"We have frequently said that prescription or adverse possession cannot be established by vague and general testimony purporting to describe the claimant's use." (footnote omitted)

[4] *See Thompson v. Scott*, 270 Or 547-548, where continuity was questioned because a broken culvert on Scott's land apparently prevented Thompson from crossing over from Scott's property to Thompson's property.

in 1975 and that he had no interference with the use of the road until 1973 when Hallberg put up a gate.[5]

Hallberg testified that in the summer of 1967 he erected a gate across the Crosby Road at its entrance to his property, keeping it locked from " '67 to the early years of '70." He gave the Schuhs a key as that is the only access to the Schuh property. Hallberg also testified that in 1973 or 1974 the Crosby Road was determined to have been a county road and from that point on the gate remained open. Three or four years before the trial Thompson got permission from Hallberg to use the road in order "to do some surveying" after people living on the property had refused permission for Thompson to go through the gate. As indicated above, Thompson in his direct testimony gave a different version with different dates, " '73 is the first time that I went up there when the gate was locked and up." Thompson also testified that another gate was up in 1971 but it was not locked or closed. When he was recalled for direct examination at the end of the trial, though, the following testimony resulted:

"Q   Mr. Thompson, there has been testimony by Mr. Hallberg that he installed a gate, and just generally being located at point 'A', and that he, or his people who are renting the place, kept that gate locked and it blocked off, he testified, the Crosby County Road. And I think you testified that he put that up in 1967, or something of that kind. Maybe you remember, and he said he maintained that road, that blocked for some period of time. Can you tell me when that gate was first put up, what year?

"A   I was in to see him in '69, and there wasn't no gate then. Another gate went up in 1970.

[5] Plaintiffs asserted in oral argument that even if Schuh did put up gates, they didn't block plaintiffs' use of the Schuh Road and so did not interrupt the prescriptive period. We need not decide this issue as there is no evidence that Thompson did go around any gates, his testimony being, rather, that there were no gates until 1975. Also, while it is true that ineffective protests do not succeed in interrupting the prescriptive period, if the servient owner does some act that would be legally actionable if an easement did in fact exist, that perhaps may be sufficient to break the prescriptive period. See *Construction Co. v. Ditch Co.*, 41 Or 209, 220, 69 P 455 (1902) and *Burby Real Property*, § 31, p 81 (1965).

"Q  Where was that gate?

"A  Where the green line is on the Crosby Road (indicating).

"Q  This is the second gate that he put up?

"A  That was. I say I was in there in '69, and there was no gate up then, but I went back in 1970, and there was a gate across there.

"Q  Was that gate locked?

"A  I don't think—. That particular time I don't think it was locked, but I went back in I think it was '71, and it was locked, and from then on it was locked most of the times we went—most of the times we went up there, until we confronted Hallberg about it.

"Q  And then what did he do?

"A  Well, after that why the suit was filed, and then —. But the gate wasn't locked everytime we went up there, but it was locked—

"Q  You filed your lawsuit?

"A  Then the gate continued locked, though, from—completely, from '73 until we found the records in '75.

"Q  And then they took the gate down?

"A  Yeah."

Plaintiffs asserted in oral argument before this court that the blockage of what turned out to be a county road should not be viewed as an interruption breaking continuity of use of the Schuh Road. Even assuming that is a valid argument, though, there was also Schuh's testimony of a locked gate installed across the Schuh Road since 1965. Scott also testified to encountering a locked gate on the Schuh Road when he attempted to move his bulldozer through in the winter of 1964-65, which was apparently just before or at the beginning of the Schuh ownership.

In addition to the natural barriers and the gates bringing into question plaintiffs' alleged continuous use of the road, there was testimony of local people who lived in the area and used the roads over which Thompson would have travelled to reach the Schuh Road that he had never been seen leaving or approaching the Schuh Road except in 1960.

Plaintiffs argue in their brief that "it is not necessary to show use on any particular day or time frame basis," and that it "is necessary only to show that the claimant made such reasonable use of the way as his needs required," citing the cases of *Feldman v. Knapp*, 196 Or 453, 250 P2d 92 (1952), and *Arrien v. Levanger*, 263 Or 363, 502 P2d 573 (1972). In both cases the court quoted authorities stating that a continuous use need not be constant and stated that an important consideration is the character of the property and the nature of the right claimed. It is at this point in the analysis of the continuity of use that consideration of notice to the landowner is necessary. That is, while slight or intermittent use may satisfy continuity requirements because of the nature of the use of the property, there is still the requirement that such use be open and notorious. Intermittent use may make it very difficult to satisfy that notice requirement. As noted in 5 Restatement, Property § 458, Comment (i), p. 2932, to satisfy the open and notorious requirement the use must be such that the landowner has a reasonable opportunity to learn of its existence and nature. See also § 459, Comment (b), p. 2937, and Powell on Real Property, § 413, p. 34-122. In *Arrien* the presence of a dam, which caused periodic flooding, served as adequate notice of the encroachment "because the existence of the dam on defendant's land served as a constant warning to plaintiff that the flooding of his land would continue to recur in varying degrees as the runoff from the surrounding watershed collected behind defendant's dam." 263 Or at 369-370. The notice requirement was also easily met in *Feldman* where the driveway at issue was used to reach the two nearby houses of the parties.

Plaintiffs asserted here that putting up the gates indicated that Schuh knew of Thompson's use of the road, and thus notoriety of use is satisfied. There was little or no evidence of that knowledge. To the contrary, Thompson testified that the first time he met Schuh was in 1973. Schuh was not asked why he put

up the gate or if there was any special reason for the gate and no trespassing signs.

■ In this case of a one-time logging operation over a summer and fall and very infrequent inspections over the rest of the required ten-year period, testimony from Schuh, Hallberg and others in the area that there had been no sign of the inspection trips until the early 1970's, and the absence of any work by plaintiffs on the road to maintain noticeable access to their property after 1960, we find that the open and notorious requirement of a prescriptive easement is not met even assuming continuity is satisfied here.

■ Plaintiffs' second assignment of error is that the trial court erred in failing to recognize that plaintiffs proved their right to use the Schuh Road by virtue of their acquisition of an easement by implication. The factors to be considered in determining whether an easement by implication will be recognized were set forth in *Cheney v. Mueller*, 259 Or at 118-119:

> "In addition, this court in *Rose* and *Dressler [Dressler et al v. Issacs et al,* 217 Or 586, P2d 714 (1959)] approved the rule as stated in 5 Restatement, Property § 476, setting forth the following factors as 'important' in determining 'whether the circumstances under which a conveyance of land (was) made imply an easement':
>
> "(a) whether the claimant is the conveyor or the conveyee,
>
> "(b) the terms of the conveyance,
>
> "(c) the consideration given for it,
>
> "(d) whether the claim is made against a simultaneous conveyee,
>
> "(e) the extent of necessity of the easement to the claimant,
>
> "(f) whether reciprocal benefits result to the conveyor and the conveyee,
>
> "(g) the manner in which the land was used prior to its conveyance, and
>
> "(h) the extent to which the manner of prior use was or might have been known to the parties."

[212]

The factors relevant to this case and the evidence associated with those factors are as follows:

(a) *Whether the claimant is the conveyor or the conveyee.*

This distinction is made because the conveyor to a greater extent than the conveyee usually controls the language and circumstances of the conveyance, and "circumstances which may be sufficient to imply the creation of an easement in favor of a conveyee may not be sufficient to imply the creation of one in favor of the conveyor." 5 Restatement, Property § 476, Comment (c). Though in *Rose et ux v. Denn,* 188 Or 1, 19, 212 P2d 1077, 213 P2d 810 (1950), which plaintiffs claim supports their case, this court did recognize that an easement may be created by implication in favor of the grantor as well as the grantee, the facts of that case are distinguishable from those at hand in several respects. In *Rose* the court decided that an easement by implication had been created when the father gave to the son land on which was a road the father still used to get to his land. Besides necessity the court emphasized the reciprocal value of the road in that the father used it in crossing the son's land and the son used it in crossing the father's land; both were required to cross each other's property. 188 Or at 25, 35. Other factors, including a lack of consideration, also suggested an implied easement.

(b) *The terms of the conveyance.*

When Gregory issued to Warren (defendants' predecessor by mesne conveyances) the warranty deed in 1953, he provided in part:

> "And I, the grantor, covenant that I am lawfully seized in fee simple of the above granted premises free from all encumbrances, excepting easement over south 16 feet of North half of Southwest Quarter for electric transmission lines. * * *"

To expressly provide for one easement in covenanting that there are no other encumbrances suggests that other easements were not intended.

[213]

(c) *The consideration given for it.*

Where the claimant is the grantor, the fact that the grantee paid consideration for the land, as here, suggests that an implied easement over the grantee's land was not contemplated. In *Rose* the fact that the father gave the son the land was viewed as an indication that they intended the road to remain open for use by the father. 188 Or at 36.

(d) *The extent of necessity of the easement to the claimant.*

In this case the cornerstone of the claim of easement by implication is necessity. Plaintiffs argue in their brief to this court that the trial court's finding that the grantor, Gregory, "landlocked" himself shows the necessity. The trial judge also determined that whatever necessity existed was terminated when Thompson gained access to the Schumacher Road in 1959. Plaintiffs asserted in oral argument before this court that an easement by implication is to be distinguished from an easement by necessity and that the cessation of necessity does not affect the easement by implication. We agree with those assertions and note that the necessity element serves a different function as a factor for easement by implication than it does as the basis for easement by necessity. With the former type of easement the necessity element is used as an indicator of the intent of the grantor and grantee at the time of the conveyance, while with the latter it is primarily of the nature of an on-going requirement, though it is also based upon the presumed intent of the conveying parties.

Though there was no other direct outside access to the short quarter, Gregory in 1953 owned connecting land to the east which included access to the Clark and Wilson right-of-way. As of 1953 and the sale to Warren, no use by Gregory of the "short quarter" was established in the record to show the reason for the necessity of the Schuh access. There was no evidence

as to whether Gregory considered the Schuh Road as necessary, though Thompson did testify that when he bought the "short quarter" in 1956 the road served the property. The degree of necessity shown in the record does not clearly evidence an implied easement. The court in *Rose* stated, 188 Or at 43:

> "In some instances, like those in which (1) an adequate consideration was paid, (2) the claimant is the conveyor and executed a warranty deed, (3) no reciprocal benefits resulted, and (4) the servitude was not clearly defined, necessity must be more pressing than in instances where other elements speak up in behalf of the alleged easement."

(e) *Whether reciprocal benefits result to the conveyor and the conveyee.*

Unlike in *Rose* where there were reciprocal benefits, none were shown here.

(f) *The manner in which the land was used prior to its conveyance.*

Though the land was described as timberland, no evidence was introduced indicating Gregory's use of this "short quarter."

(g) *The extent to which the manner of prior use was or might have been known to the parties.*

No evidence was introduced indicating whether the prior use, whatever it was, might have been known to the Warrens when they bought the property in 1953.

■  We find the evidence is insufficient to prove an easement by implication.

Included in plaintiffs' second count is the allegation that "plaintiffs have no means of access to a public road other said roadway easement," apparently an assertion of easement by necessity.[6] Actually, there is access to the "short quarter" via the old logging road which connects with Schumacher Road and apparently

---

[6] ORS 376.105-376.145 provide for the establishment of statutory ways of necessity, but were not pursued or mentioned by the parties in this case.

with the Clark and Wilson right-of-way. The main question litigated by the parties was the practicability of making the other access serviceable, with plaintiff estimating a cost of $10,000 for a summer-only road. However, there was evidence that such a road could be built for as little as $1,000, that such limited use is all that is necessary considering the 1960 logging was only in the summer and fall, that the Schuh Road from the clearing to the Thompson property also needed repair, and that the entire Schuh Road, which defendant described as 10 feet wide and plaintiff himself described as 24 to 30 feet wide would have to be drastically altered to accommodate plaintiffs' claim in their complaint of use of a road 60 feet wide. We find plaintiffs failed to prove necessity.

Affirmed.