Argued and submitted October 26, 2005, at Hood River Valley High School, Hood River, affirmed February 15, 2006

Margaret C. BEERS
and The Beers Family Trust,
*Respondents,*

*v.*

Gregory C. BROWN
and Irmingard U. Brown,
dba Riverwood Golf Course,
*Appellants.*

CV00316; A122059

129 P3d 756

Terrence Kay, P. C., argued the cause and filed the briefs for appellants.

Gina Anne Johnnie argued the cause for respondents. With her on the brief were Lincoln Scoffield and Sherman, Sherman, Johnnie & Hoyt, LLP.

Before Landau, Presiding Judge, and Ortega and Rosenblum, Judges.

ROSENBLUM, J.

**ROSENBLUM, J.**

Defendants own and operate a golf course and driving range on property adjacent to plaintiff's home and property.[1] Plaintiff brought this action for nuisance, trespass, and negligence based on her allegation that golf balls hit from defendants' driving range were landing on her property and hitting her house. Among other defenses, defendants asserted that they had obtained a prescriptive easement giving them the right to allow golf balls to go onto plaintiff's property. Defendants also filed a counterclaim, seeking to recover the cost of erecting a 70-foot-high fence between the driving range and plaintiff's property. The trial court entered a judgment awarding plaintiff damages for diminution in the value of her property and an injunction requiring defendants to take specified measures to prevent any further balls from reaching plaintiff's property; the court denied defendants' counterclaim. Defendants appeal. We affirm.

■    Defendants' arguments on appeal turn on their assertion that they established a prescriptive easement. We review prescriptive easement claims *de novo*. *Martin v. G. B. Enterprises, LLC*, 195 Or App 592, 594, 98 P3d 1168 (2004). Accordingly, based on the record before us, we find the following facts anew. Plaintiff owns approximately 47 acres in Yamhill County on the north side of Riverwood Road, which runs in a northwest-southeast direction. On part of the property near the road, plaintiff has a house, in which she lives, a barn, and several other outbuildings. To the east of the buildings lies a large field that plaintiff rents to a farmer who grows clover for animal feed. Plaintiff has owned and lived on the property since 1958.

Defendants' golf course lies on the south side of Riverwood Road. The golf course was built in the late 1960s; defendants have owned it since 1986. The driving range lies directly across the street from plaintiff's property. The teeing area is at the western end of the driving range; the range is designed so that golfers will hit balls toward the east. When

---

[1] For simplicity, we refer to Margaret Beers as "plaintiff" and as the owner of the property on which she lives, although title to the property is legally held by the Beers Family Trust, which is also a plaintiff in this action.

defendants bought the golf course, the teeing area consisted of a concrete pad, which could accommodate eight golfers at one time, and a grassy area in front of the pad. The driving range is slightly more than 300 yards long and varies in width from about 60 yards at the back end to about 140 yards at the widest point, which is about 100 yards east of the teeing area. Plaintiff's house and other buildings are essentially due north of that widest part of the range. The clover field is to the north of the eastern half of the driving range.

When defendants bought the golf course in 1986, there was no fence or any other kind of barrier between the driving range and plaintiff's property. As a result, golf balls that landed near the northern edge of the driving range sometimes bounced or rolled across the road and onto plaintiff's property. According to defendant Gregory Brown, balls that landed within 20 yards of the edge of the range could bounce or roll across the road, especially in summer, when the ground was firm. Brown also stated that he had seen "a few" balls land in the road without first hitting the range. Sometime in the late 1980s, defendants installed a six-foot high fence—a "barrier net"—along Riverwood Road. According to Brown, that fence kept "a lot of balls that were hit near the edge" from leaving the range.

In 1999, defendants decided to renovate the driving range to expand the teeing area to accommodate 20 golfers. They also added new features, including a cover over the teeing area and lighting so that golfers could use the range during bad weather and at night. As part of the project, defendants also replaced the six-foot barrier net with one that was

25 feet high. The renovations began on September 7, 1999, and were completed the following month.

Before defendants renovated the driving range in 1999, plaintiff and her stepdaughter, Sause, occasionally found golf balls on plaintiff's property, some of which had hit the house; at least one ball broke a window. At trial, Sause described the frequency with which balls came onto the property prior to the renovation as "only an occasional ball," stating further that "it wasn't very many." Plaintiff similarly described the number of balls as "[n]ot very many," and "not a lot."

After the remodeling project was completed, use of the driving range increased substantially. In 2000, the number of balls that defendants sold for use at the range[2] nearly doubled from the year before, increasing from 631,150 to 1,227,310. The number of balls landing on plaintiff's property also increased. Sause visited plaintiff from May 24 to June 3 that year. In that time, she picked up 218 balls in the field and yard. Sometime in August or September 2000, defendants increased the height of the fence along Riverwood Road to 35 feet.

Despite defendants' efforts, in October 2000, plaintiff initiated this action, alleging that, after defendants remodeled the driving range, the number of balls hitting her property had increased dramatically. Plaintiff sought compensatory damages for the alleged diminution in value of her property and an injunction barring defendants from operating the golf course and driving range until they increased the height of the fences sufficiently to protect plaintiff's property from further intrusion.

On March 22, 2001, plaintiff filed a motion for a preliminary injunction requiring defendants to cease operation of the driving range during the pendency of the action or until defendants took all reasonable and necessary actions to protect plaintiff and her property from golf balls. On October 30, 2001, the trial court issued an injunction prohibiting anyone from hitting golf balls from any location on the driving range

---

[2] A "range ball" is a golf ball intended specifically for use at a driving range. Range balls are marked with a stripe to identify them as such.

except the covered concrete pad; it also required that the driving range be closed at any time that plaintiff's lessee was working in the clover field. The court ordered that the injunction would take full effect, prohibiting all use of the driving range, on December 19, 2001. The court found that plaintiff had established that the injunction was necessary to prevent threatening behavior, and it therefore did not require her to provide a security bond pursuant to ORCP 82.

To try to avoid having the injunction take full effect, defendants installed a fence on 70-foot poles between the teeing area and the residential part of plaintiff's property and part of the clover field.[3] Safety concerns related to winter weather delayed the installation, so the trial court extended the date on which the injunction would take full effect. The new fence was eventually completed in April 2002; defendants were thereafter permitted to continue operating the driving range.

In spite of the installation of the 70-foot fence, golf balls continued to appear on plaintiff's property. In the months that followed, various people visiting plaintiff gathered several hundred balls.

On May 31, 2002, defendants filed an amended answer and counterclaims, asserting that they had obtained a prescriptive easement to use plaintiff's property; they alleged that, before plaintiff filed her complaint, golf balls had continuously and openly landed on her property for more than ten years, during which time plaintiff neither granted permission for the use nor took any action to stop it. Defendants asserted that the prescriptive easement constituted a complete defense to plaintiff's claims. In their counterclaim, defendants sought compensation for the cost of the 70-foot fence, contending that, because the easement gave them the right to allow golf balls onto plaintiff's property, the fence was unnecessary. Defendants asserted that they had installed it solely to avoid full implementation of the preliminary injunction—in other words, to avoid having the driving range shut down.

---

[3] Nothing in the record describes precisely where the 70-foot fence is located.

On September 4, 2002, the case went to trial. As pertinent to this appeal, plaintiff's evidence consisted primarily of testimony from people who had seen or picked up golf balls on her property. In addition, plaintiff brought into court a number of sacks that contained approximately 3,440 golf balls, all of which plaintiff asserted were gathered on her property.[4]

Defendants advanced a two-pronged defense. In the first prong, which is not relevant to this appeal, they challenged plaintiff's assertion that the balls found on her property actually came from the driving range. The second prong of defendants' defense, which presents the basis for this appeal, concerned their prescriptive easement claim. Defendants argued that, having allowed golf balls to go onto plaintiff's property for at least 10 years, they had obtained a prescriptive right to continue using plaintiff's property in that manner. In their view, the number of balls landing on plaintiff's property in the 10 years before the renovation established the maximum number of balls allowable under the prescriptive easement. They contended that, as long as a greater number of balls did not go onto plaintiff's property after the renovation than before it, they were within the scope of their easement rights.

Defendants did not offer any direct evidence of the number of golf balls that landed on plaintiff's property either before or after the 1999 renovation. Rather, their evidence consisted primarily of (1) a chart showing the number of balls sold for use on the driving range for each year from 1986 to 2001; and (2) testimony from three golf experts, each of whom stated that the 35-foot fence erected in August or September 2000 would, by itself, stop at least 90 percent of all balls accidentally hit toward plaintiff's property.[5]

---

[4] Plaintiff never expressly stated that the balls were all gathered after defendants renovated the driving range, but the record gives rise to that inference. For example, Sause testified that, when she had visited plaintiff before the renovation, she had picked up a few balls on plaintiff's property, which indicates that a large number of balls were not there at that time. Moreover, defendants, who bore the burden of proof on the issue, did not show that a significant number of the 3,440 balls were too old to have been in use at the driving range after the renovation.

[5] Two of defendants' experts were defendant Gregory Brown himself and his son, who worked at the golf course. Both witnesses also testified that they had

Defendants argued that, if only 10 percent of the balls could possibly reach plaintiff's property after renovation—as opposed to 100 percent before renovation—then, based on their sales figures, a significantly higher number of balls must have reached plaintiff's property during the 10-year prescriptive period than after the renovation. They noted, for example, that 10 percent of the balls sold in 2001 equaled 106,970 balls, far less than the 337,500 balls sold in 1989, the lowest-selling year in the 10 years before the renovation. Thus, defendants contended, if there was a significant increase after the renovation but before the fencing was increased to 35 feet, it was at most a temporary trespass or nuisance that did not result in any diminution in the value of plaintiff's property and no longer warranted injunctive relief.

The trial court rejected defendants' counterclaim and entered a judgment awarding plaintiff $5,500 in compensatory damages and enjoining defendants from allowing golfers at the driving range to use golf balls other than "low compression" balls.[6]

On appeal, defendants advance four assignments of error. In the first, they argue that the trial court erred in not finding that they had established a prescriptive easement allowing them to use plaintiff's property. Defendants' other assignments of error all depend on their assertion that they had a prescriptive easement. In their second assignment of error, defendants argue that the trial court erred in not ruling that the prescriptive easement was a complete defense to plaintiff's claims. Their third and fourth assignments are interrelated. Defendants renew their assertion that the 35-foot fence was adequate to reduce the number of balls landing on plaintiff's property to a number allowed by the prescriptive easement; thus, in their view, the 70-foot fence that they installed as a result of the preliminary injunction was unnecessary. Accordingly, in their third and fourth assignments of error, defendants contend that the trial court erred in not requiring plaintiff to post a surety bond as a condition for

never seen anyone intentionally hit a golf ball toward plaintiff's property from the driving range.

[6] "Low compression" golf balls are designed so that they will not travel as far as regular golf balls. According to defendants, golfers disfavor low compression balls and, as a result, are less likely to patronize the driving range.

granting the preliminary injunction, and in not awarding defendants the cost of installing the 70-foot fence.

We begin with the first assignment of error. A party seeking to establish a prescriptive easement must show, by clear and convincing evidence, an open or notorious[7] use of property, adverse to the rights of the owner, for a continuous and uninterrupted period of 10 years. *Martin*, 195 Or App at 595-96. For evidence to meet the "clear and convincing" standard, the truth of the facts asserted must be highly probable. *Shields v. Villareal*, 177 Or App 687, 694, 33 P3d 1032 (2001). A rebuttable presumption arises that a use is adverse if the claimant establishes the "continuous" and "open or notorious" requirements. *Feldman et ux. v. Knapp et ux.*, 196 Or 453, 472-73, 250 P2d 92 (1952). Continuous use "refers only to the character of the user's state of mind and requires only that the alleged easement be used in a manner consistent with the needs of the user." *Kondor v. Prose*, 50 Or App 55, 59, 622 P2d 741 (1981). We discuss the "open or notorious" requirement at length below.

Defendants argue that they met each of the requirements for establishing a prescriptive easement. First, they contend that the open or notorious requirement was satisfied because plaintiff acknowledged at trial that golf balls had been coming onto her property since at least the 1970s. Anticipating that plaintiff would argue that those occurrences were too intermittent to satisfy the open or notorious requirement, defendants renew the argument that, given the absence of the high fencing before the renovation, there must have been more balls landing on her property during the prescriptive period. Defendants next argue that the continuous requirement was satisfied because their use of plaintiff's property was consistent with their needs. Finally, they contend that, because their use was open and was continuous for at least 10 years, a presumption arises that their use was

---

[7] In many of our earlier opinions, we have referred to this requirement as the "open *and* notorious" requirement. The conjunctive statement is misleading because the requirements are, in fact, disjunctive. *See Montagne v. Elliott*, 193 Or App 639, 651, 92 P3d 731 (2004) (quoting *Restatement (Third) of Property* § 2.17 comment h, which explains that the "open" requirement and the "notorious" requirement are disjunctive). For clarity, throughout this opinion, we refer to the requirement as the "open or notorious" requirement.

adverse to plaintiff's rights. They assert further that plaintiff failed to rebut that presumption.

Plaintiff responds that, because defendants' use of her property during the prescriptive period amounted only to allowing an occasional golf ball to come onto the property, their use was too intermittent to satisfy either the open or notorious requirement or the continuity requirement. She also contends, among other things, that defendants failed to prove that their use of her property was adverse and continued for the requisite 10-year period.

■ We proceed by addressing the open or notorious requirement. To satisfy that requirement, a use must have been such that the servient owner had a "reasonable opportunity to learn of its existence and nature." *Thompson v. Schuh*, 286 Or 201, 211, 593 P2d 1138 (1979). "The purpose of the requirement that the use be open or notorious is to give the owner of the servient estate ample opportunity to protect against the establishment of prescriptive rights." *Restatement (Third) of Property* § 2.17 comment h (2000). Thus, satisfying the requirement serves to notify the owner that the use will continue—and eventually ripen into a prescriptive easement—unless he or she takes action to stop it.

■ Intermittent use can satisfy the open or notorious requirement if, during periods when there is no actual use, it is apparent that the cessation is temporary and that actual use will resume in the future. For example, very infrequent use of a road may be open or notorious if the road is clearly visible. In *Montagne v. Elliot*, 193 Or App 639, 650-51, 92 P3d 731 (2004), in which several claimants alleged that they had established a prescriptive easement for use of a road, we held that the open or notorious requirement was satisfied even though the claimants' use of the road was "sporadic and infrequent"—some of the claimants had visited their property as few as two or three times during a period of more than 20 years. Our conclusion was based in part on the fact that the claimants had maintained the road, so it was "clearly visible and apparent." *Id.* at 652. We noted that, under the circumstances, the "existence of a well-established road informs the owner of the underlying land that someone is using it * * *." *Id.* Thus, even though there were long periods during which

the claimants did not actually use the road, the condition of the road was such that it was apparent that they intended to use it again in the future.

On the other hand, infrequent use does not satisfy the open or notorious requirement if it is not apparent that the use is ongoing or that actual use will resume in the future. *Thompson* is illustrative. In that case, the easement claimants reached their property via an unpaved road across a neighboring lot. In the summer and fall of 1960, they harvested timber on their property, using the road to take equipment in and to haul logs out. One of the claimants testified that he used a Caterpillar to clear parts of the road at that time. Thereafter, the claimants used the road four to six times a year to make "inspection trips" on their property. 286 Or at 205-07. The Supreme Court held that they had failed to satisfy the open or notorious requirement because there had been "no sign of the inspection trips" and an "absence of any work by [the claimants] on the road to maintain *noticeable* access to their property after 1960 * * *." *Id.* at 212 (emphasis added).

As *Thompson* illustrates, it is not enough that a use is apparent for only part of the prescriptive period. The use must be open or notorious throughout the prescriptive period. *Montagne*, 193 Or App at 651. As noted, the use must have been such that the servient owner had a "reasonable opportunity to learn of its existence and nature." *Thompson*, 286 Or at 211. Part of the "nature" of the use that must be apparent is its ongoing or recurrent nature. *See Arrien v. Levanger*, 263 Or 363, 369-70, 502 P2d 573 (1972) (where prescriptive easement was established by the defendant's regular flooding of the plaintiff's land, the "existence of the dam on [the] defendant's land served as a constant warning to [the] plaintiff that the flooding * * * would continue" and was "of sufficient recurrence to give [the] plaintiff warning" of the defendant's claim). When actual use has stopped and there is no indication that it will resume, the owner has no reason to know that a risk exists that the property will become subject to a prescriptive easement and that action is required to eliminate that risk. *See Restatement* at § 2.17 comment h (purpose of the open or notorious requirement is to allow the servient owner to "protect against the establishment of prescriptive

rights"). In short, in the absence of any indication that a use will resume, if actual use ceases, it is no longer open or notorious, and the prescriptive period therefore ends; any resumption in actual use that follows begins a new prescriptive period.

In this case, defendants established that plaintiff knew that golf balls had landed on her property at some point in the past, but they did not carry their burden to establish that open or notorious use occurred *throughout the 10-year prescriptive period*. Although plaintiff testified that she knew some golf balls had landed on her property since the driving range had been there, there is no persuasive evidence as to the number of balls or the frequency with which they were landing on plaintiff's property.

If defendants had established that golf balls had been landing on plaintiff's property with sufficient consistency over a 10-year period, that would be evidence that plaintiff had been on notice that, unless she took action, her property was at risk of becoming subject to a prescriptive easement. If, on the other hand, there were extended periods during which no balls landed on her property—particularly, after defendants had undertaken measures to build fences and keep balls off her property—defendants' use of plaintiff's property would not have been sufficiently open or notorious to inform plaintiff of their use.[8]

As stated above, the record does not establish the frequency with which balls landed on plaintiff's property. The golf course had been next to plaintiff's property since the late 1960s. Plaintiff and Sause both testified that balls "occasionally" came onto the property, but neither testified with any more specificity as to *when* or with what regularity those balls landed on the property. Defendant Gregory Brown testified that, before the six-foot fence was installed in the late

---

[8] We do not believe that the continued existence of the driving range would, by itself, be enough to indicate that the use would resume. If golf balls stopped landing on plaintiff's property for an extended period of time, a reasonable person could assume that defendants had taken steps to stop any further use. Case law does not contradict that conclusion. The existence of the driving range is not comparable to the existence of the dam in *Arrien. See* 263 Or at 369-70. With a dam, continued flooding is inevitable. The driving range is also not comparable to the well-established and maintained road in *Montagne. See* 193 Or App at 652. A driving range can be operated without intruding on neighboring property.

1980s, he saw golf balls roll or bounce onto plaintiff's property, but he did not say how often that occurred. The record is devoid of any other persuasive evidence on the issue—an issue on which defendants carried the burden of proof by clear and convincing evidence.

As noted, defendants argue that, given the number of balls sold and the absence of high fencing before the renovation to the driving range, it is logical to infer that more balls landed on plaintiff's property before the renovation than after and that they did so on a regular basis and in sufficient numbers to give plaintiff notice of the nature of defendants' use of her property. However, defendants' theory ignores the fact that, as Gregory Brown himself testified, the six-foot fence installed in the late 1980s kept "a lot of balls" from leaving the range that otherwise would have. Thus, because the fence was certain to stop at least some of the balls, their assumption that 100 percent of balls hit before the 1999 renovation had the potential to land on plaintiff's property is incorrect. Moreover, the evidence on which defendants rely—their sales figures and the testimony as to what percentage of balls the 35-foot fencing would stop—shows, at most, that more balls had the *potential* to reach plaintiff's property before the renovation than after it, not that more balls *actually* did, much less that they did so consistently for at least 10 years. Defendants' theory ignores other factors that may also determine whether any given ball actually went onto plaintiff's property or merely had the potential to do so, including the size and skill of the golfer and whether the golfer intentionally tried to hit the ball toward plaintiff's property. The record does not indicate that those factors remained consistent throughout the putative prescriptive period. As a result, the inference that defendants urge is purely speculative.

In short, defendants failed to show by clear and convincing evidence that their use of plaintiff's property was open or notorious throughout the prescriptive period.[9] It follows that the trial court did not err in ruling that they failed to establish a prescriptive easement.

---

[9] Because defendants did not satisfy the open or notorious requirement, we need not consider whether their use of plaintiff's property met the continuous and adverse requirements.

In light of our conclusion with respect to defendants' first assignment of error, we reject their remaining assignments of error as well.

Affirmed.