Argued and submitted September 11, vacated in part; otherwise affirmed
November 8, 1995

Robert E. RATH
and Sonja R. Rath,
husband and wife,
as Trustees of Robert E. Rath
and Sonja R. Rath Trust,
*Appellants,*

*v.*

Edwin B. HAYCOCK
and Marcia K. Haycock,
husband and wife,
*Respondents.*

(93-CV-124)

Edwin B. HAYCOCK
and Marcia K. Haycock,
husband and wife,
*Respondents,*

*v.*

Robert E. RATH
and Sonja R. Rath,
as Trustees of the Robert E. Rath
and Sonja R. Rath Trust under
Declaration of Trust dated October 28, 1991,
*Appellants.*

(93-CV-125; CA A84344)

905 P2d 854

Richard A. Stark argued the cause for appellants. With him on the briefs was Stark and Hammack, P.C.

John C. Babin argued the cause for respondents. With him on the brief was Babin and Keusink, P.C.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

Plaintiffs appeal from a judgment quieting title in defendants to a small strip of land and denying plaintiffs an easement on a road on defendants' property. On *de novo* review, ORS 19.125(3), we affirm the trial court's determination as to the ownership of the road, but reverse its award of attorney fees to defendants.

Plaintiffs and defendants own adjoining properties in Curry County.[1] Plaintiffs' property will be referred to as tax lot 706 and defendants' property as tax lot 707. Both properties were originally owned by a common grantor, Dulca Wallmark. Lot 706 was part of a larger parcel of land that was directly north of lot 707. In 1973, Wallmark subdivided the larger parcel into five lots, including tax lots 705, 706 and 709. Tax lot 707 is bordered on the north by tax lot 706 and tax lot 705. After subdividing the larger parcel, Wallmark sold tax lot 706 to the Klauers, who are plaintiffs' predecessors in interest.[2] She also sold tax lot 705 and tax lot 709 to other parties, but retained tax lot 707 on which to reside.

Highway 101 runs to the east of the lots and each lot had access to that highway through a series of easements. Wallmark constructed a road along the north border of tax lot 707 to provide access from her residence to the other easements that led to Highway 101. On the border between tax lots 705 and 707, a large hedge grew that separated tax lot 705 from the road on tax lot 707. About the time of the subdividing, Ocean View Drive, a new road lying west of the properties, was completed. Of all the lots, only tax lot 707 bordered Ocean View Drive.

During their negotiations to buy tax lot 706, the Klauers requested that Wallmark grant them an easement for tax lot 706 across tax lot 707 to Ocean View Drive. Apparently, the owner of tax lot 709 had blocked the easement that gave tax lot 706 access to Highway 101, leaving tax lot 706 effectively landlocked. On April 3, 1973, Wallmark granted the Klauers an easement across tax lot 707. The

---

[1] See Appendix A.

[2] Although the Klauers' name is spelled "Clower" in the deed, all the other documents in the trial court file spell the name as Klauer. We will therefore refer to them as the Klauers.

easement was a limited one in that its location provided access only to the west side of a mobile home that the Klauers had placed on their property. We will refer to that easement as the "Klauer easement." Around the same time, Wallmark installed a road that provided her access from her residence to Ocean View Drive. That road begins at the northwest corner of tax lot 707 and Ocean View Drive, the same area in which the Klauer easement exists, and runs easterly until it connects with the road that Wallmark had originally constructed. The property in dispute in this case lies in the portion of the road that is between the easterly boundary of the Klauer easement and the easterly boundary of tax lot 706. In other words, plaintiffs seek the right to use the road as access to the easterly portion of their property.

In 1976, Wallmark became ill and gave her son a quitclaim deed for tax lot 707, although she remained on the property until her son sold it to defendants in 1989. From the evidence, it appears that the owners of tax lot 706 considered Wallmark to be the owner until she left the property in 1989. The evidence also persuades us that from 1973 to 1988, the easement granted to the Klauers was the sole access from Ocean View Drive to tax lot 706. Wallmark testified that the owners of tax lot 706 never used her road without first requesting permission from her. For example, the owners of tax lot 706 requested permission to use the road in order to place a travel trailer on the east side of their mobile home.

In 1988, the Hueys bought lot 706. Mr. Huey testified that he believed he had an easement on the road that provided him with access to either side of his mobile home. Accordingly, he used the road without asking permission. In 1990, the Hueys sold tax lot 706 to plaintiffs, and plaintiffs used the road in a similar manner. Sometime later, plaintiffs had their property surveyed in preparation for building a home on it. The surveyor determined that the boundaries of tax lot 706 included an 8.5-foot strip of the road, and plaintiffs placed stakes in the road to mark the boundaries. Defendants responded by blocking the road so that plaintiffs could only use the Klauer easement. As a result, both parties brought actions[3] against each other, which were consolidated for trial.

---

[3] The claims included plaintiffs' claims for ejectment, quiet title and a request for a declaration that they had acquired a prescriptive easement along the road.

At trial, plaintiffs offered evidence of a survey. The survey demonstrated that there were discrepancies in the original legal descriptions of the lots. There was a discrepancy in the legal description of tax lot 706 in that it did not "close" on its south side. According to plaintiffs' witness, who had done the survey of tax lot 706, the west boundary was 8.5 feet longer than it should have been, based on the descriptions of the eastern and southern boundaries. According to plaintiffs' witness, the problem could be remedied by reducing the western boundary of tax lot 706 by 8.5 feet, or by increasing its eastern boundary by the same distance. The latter alternative would result in the description of tax lot 706 encompassing the disputed portion of the road.

The other discrepancy involved the legal description of tax lot 707. According to the description for tax lot 707, the northern boundary of lot 707 fell short of the southern boundary of lot 705 by 8.5 feet, and it also failed to include the disputed 8.5-foot strip between lots 707 and 706.

Plaintiffs argued that the discrepancies demonstrated that Wallmark had intended to include an additional 8.5 feet in tax lots 705 and 706, which would have resulted in the various descriptions closing with each other. Defendants' expert witness testified that, based on the monuments for tax lot 705 and a survey for another lot that bordered tax lot 706 to the west, the descriptions demonstrated that the disputed land was intended to be part of tax lot 707. After hearing the evidence, the trial court concluded:

> "The disputed property belongs to the defendants. The reasoning submitted by the defendants' witness * * * appears to be the more convincing. His findings were based on the opinion that it was more accurate to shorten the West line of [lot 706] than to lengthen the East line of [lot 706]. His survey and findings were further supported by the existing monuments, including verified iron rods and pipes."

The trial court also concluded that plaintiffs' alternative theories of "boundary by acquiescence" and of a prescriptive easement failed because of lack of evidence. The trial court,

---

Defendants brought an action including claims to quiet title to the road, ejectment and for trespass.

therefore, quieted title to the land in defendants and awarded them damages and attorney fees on their claim of trespass.

On appeal, plaintiffs first assign error to the trial court's determination that the disputed portion of land belongs to defendants. They argue:

"The legal description of [lot 706] contain[s] a clear error in that the description d[oes] not close. This is a clear *ambiguity*. The legal description to [lot 707 has] an accurate metes and bounds legal description that correctly described their property. * * * Ambiguities in a deed must be construed against the grantor which, based on the facts of this case, should result in the 8.5 foot disputed strip being included as part of the [p]laintiff's property.

"* * * * *

"The surveyors for both parties testified that the description to [p]laintiffs' property did not close and to correct the problem the west line could be shortened or the east line could be lengthened to correct the error. Obviously if [p]laintiffs' west line was shortened plaintiffs would lose the 8.5 feet. This would result in [d]efendants getting *more* property than was conveyed by Wallmark to [her son] in 1976 by a deed with an *accurate metes* and *bounds* description * * *." (Emphasis in original.)

Defendants contend that we must first look to the intent of the parties to resolve an ambiguity in a legal description. In *Verzeano v. Carpenter*, 108 Or App 258, 815 P2d 1275 (1991), we considered what the term "lands belonging to grantor" meant in a deed reserving an easement on the grantee's property to the grantor. The issue focused on what property of the grantor was included in the dominant estate. We first considered the rule of construction explained in George W. Thompson, *Real Property* § 3022 (1962):

"In the construction of a valid deed ambiguous on its face, there are but two possible sources of information, namely, the facts and circumstances of the case and the intention of the parties as declared by them before, at or after the making of the deed."

We determined that as to some of the disputed lands, there was little evidence of what the parties intended. As a result, we resorted to the rule of construction that "[w]hen there is

an ambiguity in a deed, the general rule is to construe it against the grantor." *Verzeano*, 108 Or App at 263.

■■ In this case, the legal description for tax lot 706 is ambiguous because, when read with the legal description for tax lot 707, the descriptions do not close. However, it is not necessary to resort to a rule of construction, because it is clear from the evidence that Wallmark and the Klauers did not contemplate that the disputed land would be part of tax lot 706. As the trial court pointed out, the Klauers' request for an easement would have been unnecessary, had they believed their boundary extended an additional 8.5 feet in a southerly direction. Under those circumstances, tax lot 706 would have bordered Ocean View Drive. Furthermore, the Klauers treated the entire road as belonging to Wallmark, and did not dispute Wallmark's claim that it was her road. In the light of the evidence, we conclude that the original parties intended the area on which the road lies to be a part of tax lot 707.

■ Plaintiffs also assign error to the trial court's failure to find that the parties resolved their boundary dispute by an implied agreement recognizing that part of the road was on tax lot 706, or in the alternative, that plaintiffs acquired the disputed area by prescription. As we have indicated earlier, the facts as we have found them do not support either theory. We are not persuaded that Wallmark ever recognized an uncertainty about the ownership of the disputed area or agreed expressly or impliedly that the road was on tax lot 706 in part or in whole.[4] Moreover, the elements of a prescriptive easement have not been satisfied.[5]

Finally, plaintiffs assign error to the award of attorney fees to defendants on their trespass claim.[6] They argue

---

[4] The essential elements of the doctrine of boundary established by agreement are (1) an initial uncertainty or dispute as to the true location of the boundary; (2) a resolution of the uncertainty by an express or implied agreement to recognize a particular line as a boundary; and (3) evidence that the parties recognized that boundary by their subsequent conduct. *Ross v. DeLorenzo*, 65 Or App 586, 590, 672 P2d 1338 (1983).

[5] In order to establish an easement by prescription, the plaintiffs must establish an open and notorious use of the defendants' land adverse to the rights of the defendants for a continuous and uninterrupted period of ten years. *Thompson v. Schuh*, 286 Or 201, 206, 593 P2d 1138 (1979).

[6] Plaintiffs also assign error to the trial court's failure to award damages to plaintiffs. Because of our disposition of this case, we need not consider that assignment of error.

that defendants were not entitled to attorney fees, because they did not make a written demand for payment of their claim of damages within 10 days of the commencement of their action against plaintiffs. ORS 20.080(1) provides:

"In any action for damages for an injury or wrong to the person or property, or both, of another where the amount pleaded is $4,000 or less, and the plaintiff prevails in the action, there shall be taxed and allowed to the plaintiff, at trial and on appeal, a reasonable amount to be fixed by the court as attorney fees for the prosecution of the action, *if the court finds that written demand for the payment of such claim was made on the defendant not less than 10 days before the commencement of the action* or the filing of a formal complaint under ORS 46.465(3) or not more than 10 days after the transfer of the action under ORS 46.461. However, no attorney fees shall be allowed to the plaintiff if the court finds that the defendant tendered to the plaintiff, prior to the commencement of the action or the filing of a formal complaint under ORS 46.465(3) or not more than 10 days after the transfer of the action under ORS 46.461, an amount not less than the damages awarded to the plaintiff." (Emphasis supplied.)

Initially, when the parties filed their respective actions against each other in April 1993, only plaintiffs requested attorney fees. Defendants made a Rule 21 motion to dismiss the portion of plaintiffs' complaint that requested attorney fees, arguing that attorney fees were not available in a "purely possessory action." The trial court denied the motion, but granted defendants leave to amend their complaint to include a claim for attorney fees. On October 28, 1993, defendants first made written demand for payment of their claim for damages, and on November 12, 1993, they filed an amended pleading requesting attorney fees.

Plaintiffs argue that the "commencement" of defendants' action occurred in April 1993, and therefore, defendants' written demand on October 28, 1993, did not meet the notice requirements of ORS 20.080(1). Defendants argue that the "spirit and reason of law [take] precedence over its punctuation." They contend that the purpose of the ten-day notice requirement is to give the other party an opportunity to settle the case and to notify the opposing party that they

may be liable for attorney fees, and that, in this case, those purposes have been met.

■■ We are not persuaded that what occurred here comports with the legislature's intent to encourage putative litigants to avoid attorney fee awards by settling disputes before actions are filed. The intent of the legislature in promulgating a statute is to be discerned from the statute's text and context unless its language is unclear. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). The language of ORS 20.080(1) is clear. The "commencement of the action" does not mean the filing of an amended complaint. The trial court had no authority to add to the language of ORS 20.080(1) by permitting defendants to seek attorney fees as part of their amended complaint, and it erred in permitting defendants to make a claim for attorney fees based on their trespass claim without first complying with the notice requirements of the statute.

■ Defendants also argue that the ten-day demand requirement is not applicable to them, because they are entitled to attorney fees under ORS 20.080(2). That subsection provides:

"If the defendant pleads a counterclaim, not to exceed $4,000, and the defendant prevails in the action, there shall be taxed and allowed to the defendant, at trial and on appeal, a reasonable amount to be fixed by the court as attorney fees for the prosecution of the counterclaim."

Defendants contend that because the cases were consolidated, and the parties agreed that defendants would be designated as the "defendants" in the consolidated case, their complaint against plaintiffs should be treated as counterclaims. We disagree. Although defendants could have asserted their claims for damages as counterclaims, they chose to bring a separate action against plaintiffs. Consolidation of actions does not merge suits into a single cause or change the rights of the parties. *See Johnson v. Manhattan Railway Co.*, 289 US 479, 496-97, 53 S Ct 721, 77 L Ed 1331 (1933) (holding that under a similar rule, FRCP 53, consolidation does not merge discrete actions into a single cause of action). Because defendants made their claim for damages in

their separate action against plaintiffs, ORS 20.080(1) controls. The trial court erred in permitting defendants to make a claim for attorney fees and awarding fees on the claim.

Award of attorney fees vacated; otherwise affirmed.

# APPENDIX A