No. 10          September 18, 2018          193

IN THE OREGON TAX COURT
REGULAR DIVISION

STATE ex rel CITY OF HAPPY VALLEY,
*Relator,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant*,

*and*

CLACKAMAS COUNTY
and North Clackamas Parks and Recreation District,
*Defendant-Intervenors.*

(TC 5334)

In a mandamus proceeding, the City of Happy Valley asked the court to order the Department of Revenue (the department) to approve a boundary change under ORS 308.225 related to city's attempt to withdraw from the North Clackamas Parks and Recreation District and impose its own levy to support park property within the city. The parties disagreed on whether the statute authorized the department to determine the city's authority when the city submitted the proposed change. Upon review of the text, context, and legislative history, the court held that the statute does not authorize the department to analyze the substantive authority of the filer of a legal description and map of a boundary change because the department's limited role under ORS 308.225 does not include substantively approving the boundary change.

Submitted on cross-motions for summary judgment.

Christopher D. Crean, Beery Elsner Hammond, LLP, Portland, filed the motion and argued the cause for Relator City of Happy Valley.

Darren Weirnick, Senior Assistant Attorney General, Department of Justice, Salem, filed the cross-motion and argued the cause for Defendant Department of Revenue.

Kathleen J. Rastetter, Clackamas County Counsel, Oregon City, filed a response for Defendant-Intervenors Clackamas County and North Clackamas Parks and Recreation District.

Decision for Relator rendered September 18, 2018.

**ROBERT T. MANICKE, Judge.**

## I.  INTRODUCTION

In this mandamus action, Relator City of Happy Valley (the city) has asked the court to order Defendants the Oregon Department of Revenue and its director (collectively, the department) to approve a "boundary change" for certain property within the city, or to show cause why the department should not be required to approve the change. Clackamas County (the county), where the city is located, intervened as a defendant, as did the North Clackamas Parks and Recreation District (the district, and with the county collectively, the county). All parties filed or joined in cross-motions for summary judgment. The court finds no material facts in dispute.

## II.  FACTS

The court summarizes here selected facts from the parties' stipulations or from declarations or documents, the accuracy of which no party has challenged. On June 6, 2017, the city council adopted Ordinance 522 providing that the city was withdrawing from the district effective December 31, 2017. On February 8, 2018, the city filed a copy of Ordinance 522 and a map showing the boundary change with the county assessor and with the Cartographic Information Systems Unit (CISU), the group of department employees who normally receive and process requests for approval of legal descriptions and maps of boundary changes. Over the course of the following month, city personnel communicated with CISU personnel, requesting a formal legal description and corrections to the map, and the city corrected its filing. The department, through the CISU, approved the legal description and map of the boundary change, as corrected, in a writing dated March 7, 2018.

Meanwhile, a parallel set of communications commenced in late January 2018 when the assessor's office contacted the department's manager, Rebecca Hall, whose duties include overseeing the CISU. The assessor's office asked Hall whether the city, having voted to join the district, could later withdraw from the district by a vote of the city council. These communications continued until

mid-May while Hall researched and analyzed the issue. On May 8, 2018, Hall sent an email to the county stating the department's conclusion that "the procedure used by Happy Valley was not appropriate and no boundary change should be recognized at this time for tax assessment purposes." Hall had concluded that the city's withdrawal was invalid as a matter of law, based on her interpretation of provisions of ORS chapters 222 and 198.[1]

The personnel in the CISU were unaware of Hall's research and discussions about the validity of the city's withdrawal until after they had issued the March 7 approval, and Hall was unaware of the March 7 approval by the CISU personnel until April 19, 2018, as the normal practice of the CISU does not include notifying Hall as each application is received and processed. The department did not express or suggest concerns to the city about the validity of Ordinance 522 before the March 7 approval.

Direct communications between Hall and the city began on May 17, 2018, when Hall spoke with the city's counsel, Christopher D. Crean, explaining why the department had concluded that the boundary change could not be recognized for tax purposes. Hall sent a written explanation to Crean by email dated May 23, 2018. On June 19, 2018, the department formally notified the city and the district that the department had rescinded the March 7 approval. The sole reason stated in the June 19 rescission letter was that the city's boundary change request "was not filed with the department 'by the person, governing body, officer, administrative agency or court that is or will be responsible for determining whether the boundary change is final' as required by ORS 308.225(2)(a).[2] The department has determined the authority responsible for determining whether this particular boundary change is final is the Clackamas County Board and not the City of Happy Valley."

---

[1] To summarize in broad strokes, Hall concluded that the city was required to obtain consent of the Clackamas County Council in order to withdraw. Because the city had proceeded solely under the authority of its own Ordinance 522 and had not sought the county's consent, Hall concluded that the city's withdrawal was invalid.

[2] Unless otherwise stated, the court's references to the Oregon Revised Statutes (ORS) are to the 2017 edition.

On June 25, 2018, the city filed a petition, subsequently amended, for a writ of mandamus in this court. The Amended Alternative Writ of Mandamus dated June 28, 2018, seeks an order commanding the department to approve the city's original request for a boundary change pursuant to ORS 308.225 or to show cause why it refuses to do so.

The foregoing facts arise against a larger backdrop, which the court now briefly explains as context for the specific issues here. In 2006, city voters approved an ordinance entitled "In the Matter of Annexing the Territory of the City of Happy Valley to the North Clackamas Parks and Recreation District." Thereafter, the city council became dissatisfied with the relationship for reasons recited in the city's June 6, 2017, Ordinance 522 declaring the city's withdrawal from the district and its intention to reclaim management of the parks within city territory. Litigation in Clackamas County Circuit Court ensued. Although the validity of the city's withdrawal from the district was not initially at issue, it now is pending in two cases:

*Circuit Court Case 1.*   On October 9, 2017, the city filed suit against the county and the district in Clackamas County Circuit Court (No. 17CV44060) (Circuit Court Case 1) seeking, among other things, a division of assets related to the withdrawal. In defending Circuit Court Case 1, the county and the district initially agreed with the city that the city's withdrawal pursuant to Ordinance 522 was legally effective, but the county and the district recently have moved to file a third amended answer that would change their position and add as an affirmative defense that the withdrawal was ineffective. ("ORS 451.435, and ORS 198.705 to ORS 198.955 *provide the sole method* and the remedies available *for the City to withdraw territory from NCPRD*.") (Emphases added.)

*Circuit Court Case 2.*   On July 18, 2018, the county assessor and the district filed suit against the city in Clackamas County Circuit Court (No. 18CV30439) (Circuit Court Case 2) seeking among other things a declaratory judgment to the effect that the city's efforts to withdraw from the district, including by Ordinance 522, are invalid.

One additional set of facts relating to timing is worth noting. On May 15, 2018, voters within the city approved City Measure 3-526. The city represents in this case and in Circuit Court Cases 1 and 2 that Measure 3526 will subject taxable property within the city to a new layer of property tax at exactly the same rate presently imposed by the district on the same taxable property. Thus, as long as the validity of the city's withdrawal from the district remains in question, there is a risk that the district's preexisting tax and the city's new tax will apply simultaneously to the same property, commencing with the tax year July 1, 2018 through June 30, 2019. The department and the county do not dispute this, but they argue that "double taxation" of the same property can be avoided if the city forgoes its new tax pursuant to Measure 3526 until the issue of the validity of the city's withdrawal is resolved. The county assessor has informed the parties that she will have sufficient time to certify the tax roll for the property tax year beginning July 1, 2018, if the parties or the court can provide final direction on or about September 15, 2018.

## III.  ISSUES

As the foregoing shows, the issue of the validity of the city's withdrawal from the district by Ordinance 522 underlies this case and is at least a substantial component of each of the two Circuit Court cases. For purposes of *this* case, the court frames the issues as follows:

(1) The first issue is whether ORS 308.225 authorizes the Department of Revenue to determine whether the person presenting a boundary change or a proposed boundary change to the department for purposes of approval of its map and description is the "person *** responsible for determining whether the boundary change is final" under ORS 308.225(2)(a).

(2) If so, the second issue is whether the court has jurisdiction to review the department's substantive determination.

(3) If the court has jurisdiction, the third issue is whether the department correctly determined that

the city was not the "person *** responsible for determining whether the boundary change is final" on the ground that the city's withdrawal from the district pursuant to Ordinance 522 was invalid.

(4) If the court upholds the department's determination, the fourth issue is whether the department's purported rescission on June 19, 2018, of its March 7, 2018, acceptance of the city's legal description and map was valid.

## IV.   ANALYSIS

This case arises under ORS 308.225, which generally governs whether a county assessor must apply, or disregard, changes in the boundaries of local property taxing jurisdictions when preparing the annual property tax roll. At issue is the department's role in approving or disapproving documents submitted with respect to a boundary change. The text of ORS 308.225 is reproduced in full as Appendix A to this order.

A.   *First Issue: Scope of Department's Authority Under ORS 308.225*

The first issue is whether ORS 308.225 authorizes the Department of Revenue to determine whether the person presenting a boundary change[3] or a proposed boundary change to the department for purposes of approval of its map and description is the "person *** responsible for determining whether the boundary change is final" under ORS 308.225(2)(a).[4] The city asserts that the department's role under ORS 308.225 is limited to reviewing the legal description and map for accuracy, a task that is well within the department's expertise and that is achievable in the short timeframes set by the annual property tax cycle. To conclude otherwise, the city argues, would require the

---

[3] ORS 308.225(3) defines "boundary change" as "the change that occurs in the boundaries of a district" by reason of any of five listed events, including formation, annexation or dissolution of a district, or as in this case, the withdrawal of territory from a district, such as Defendant-Intervenor North Clackamas Parks and Recreation District.

[4] The parties agree, and the court likewise concludes, that this issue is well within the court's jurisdiction to adjudicate questions involving the tax laws of the state. *See* ORS 305.410.

department to delve into a complex, unfamiliar and time-consuming analysis of municipal law, a responsibility that the legislature did not intend to assign to the department. The department asserts that the legislature could not have intended that the department *ignore* whether the filer is the "responsible" person. The department argues that, unless it analyzes the authority of the filer, absurd results might ensue—such as a city withdrawing altogether from taxation by the county in which it is located, or an individual withdrawing his personal residence from a taxing district in order to reduce his property tax—all by the mere act of filing a map and legal description.[5] Ultimately, "any Tom, Dick or Harry" might be able to get approval from a department forced to wear "blinders" while reviewing the map and legal description. The city responds that there are sufficient checks that would prevent the "rogue city" scenario, starting with the public meeting and comment process by which a municipal body must effect any withdrawal or other boundary change, and followed by the ability of an interested person to challenge a city's purported change via a declaratory judgment action. At oral argument, counsel for the city stated, "There is substantial public notice [of a boundary change] and particularly *** the entity from whom the area is being withdrawn is provided notice." According to the city, the availability of these checks makes it unlikely that the legislature intended to make the department responsible for investigating and enforcing a filer's authority.

1. *Text Analysis*

The court interprets ORS 308.225 based on its text, context and legislative history. *See State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009). The principal relevant language is found in subsection (2)(a):

"If a boundary change is made or proposed, the person, governing body, officer, administrative agency or court that is or will be responsible for determining whether the boundary change is final shall file with the county assessor and the Department of Revenue the legal description of

---

[5] For convenience, the court later refers to these scenarios as the "rogue city" and "rogue taxpayer" scenarios.

> the change or proposed change and an accurate map show-
> ing the change or proposed change in final approved form,
> on or before March 31 of the assessment year to which the
> boundary change applies."

ORS 305.225(2)(a). Subsection (2)(a) contains no explicit
direction to the department to determine the status of a filer;
therefore, the question is whether subsection (2)(a) implicitly
directs the department to do so. The text of subsection (2)(a)
indicates that it is directed to any "person," such as the
city in this case, that seeks a boundary change. "Person,"
and the additional actors listed thereafter, are the subject
of the sentence, while the department and the assessor are
named solely as the offices with which such a person must
file the legal description and map. The direction is clear:
Such a person "shall file" the legal description and map of
the boundary change with the department and with the
assessor.

By contrast, other provisions in the same statute
are clearly directed to the department and explicitly require
the department to take specific action. In the first sentence
of subsection (2)(c), the department (or the assessor) is the
named actor that "shall provide" a map to the filer within
14 days. The second sentence explicitly names the filer as
actor, with the direction that the filer "shall accurately
enter" the boundary line on that map. ORS 308.225(2)(c).
Subsection (6) interrupts this pattern of naming the intended
actor as the subject, as it uses the passive voice and names
no agents; nonetheless, it clearly directs (1) a filer to submit
the legal description and map to the department ("shall be
submitted") and (2) the department to approve or disapprove
the legal description and map within 30 days of receipt
("shall be *** approved or disapproved"). Subsection (7)
resumes the prior pattern, explicitly directing the depart-
ment to notify both the filer and the assessor ("shall provide
notice") of the department's approval or disapproval of the
legal description and map within five days after the depart-
ment's determination. In short, the legislature phrased sub-
section (2)(a) as a direction to *filers*, while phrasing other
subsections as directions to other persons, including the
department. The court finds that this choice of language
does not support an implication that the department must

verify whether the filer is a person responsible for determining whether the boundary change is final.

### 2. *Statutory Context*

The context supplied by the remaining portions of ORS 308.225 and other property tax statutes reveals no intention to require the department to verify the filer's authority. Instead, the context shows that the legislature's concerns are to ensure that the legal description and map are accurate and that they are finalized within the time constraints set by the annual property tax cycle. The statute twice emphasizes accuracy explicitly, directing filers to submit an "accurate map" in subsection (2)(a) and again to "accurately enter the boundary line on the map" in subsection (2)(c). The statute also directs a filer to show the boundary change in "final approved form," *i.e.*, in the form in which the assessor will record it on the annual property tax roll, and not merely in the form of a draft or estimate. *See* ORS 308.225(2)(a), (d); 45 Or Op Atty Gen 203, 205-06 (1987). Subsection (2)(b) contains lengthy specifications for the legal description, including, critically, a requirement that the description begin and end at the same point. *See* ORS 308.225(2)(b)(A) ("final course ends at the point of beginning"). Subsection (2)(c) ensures that the map will be accurate by requiring the filer to start with a map that the department or the assessor provides. Anticipating the difficulties of reaching this level of accuracy, the statute directs the department to explain to the filer any steps needed to "correct" a rejected legal description or map, and to cooperate with the filer to ensure an accurate filing. *See* ORS 308.225(7).

All of this work must occur on a tight deadline: The department must receive the legal description and map on or before March 31 (ORS 308.225(2)(a)), approve or disapprove it within 30 days (ORS 308.225(6)), and notify the filer within five days after that (ORS 308.225(7)). Subsection (7) urges filers and the department to complete *all* steps, including any corrections, on or before March 31 "whenever possible." The apparent goal is to give the assessor as much lead time as possible before the assessor must certify the roll and deliver it to the tax collector in time for

the collector to generate and mail all bills by October 25. *See* ORS 311.105 (requirement to certify roll); ORS 311.115 (requirement to deliver roll in time for October 25 mailing); ORS 311.505 (taxpayers must pay at least one-third of tax owed on or before November 15). The assessor presumably needs this lead time for tasks such as re-coding the records of each individual parcel of affected property to show that the parcel is subject to the taxes of the "new" local taxing jurisdiction (*e.g.,* a county, city, port, school district, transit district or other district whose territory now includes the subject parcel) and is no longer subject to the taxes of any former taxing jurisdiction that was displaced by the boundary change.

Reading the foregoing additional provisions of ORS 308.225 for context, the court finds no indication that the legislature intended to direct the department to analyze whether a city presenting the map and legal description of a boundary change undertook the proper steps under municipal law to become the "person *** responsible for determining whether the boundary change is final" under subsection (2)(a). ORS 308.225 gives clear and specific direction to the department to perform certain tasks (cooperating with filers; approving, correcting or disapproving legal descriptions and maps), but no such instructions with respect to the identity of a filer. The court finds further that the brevity of the 30-day period in which the department is required to act is a significant indicator that the legislature did not intend the department to undertake a potentially complex legal and factual analysis of the filer's authority to effect a particular boundary change.[6]

3.  *Legislative History*

The court turns to legislative history for any further insight into the legislature's intent regarding the

---

[6] Indeed, the department's manager in charge of the boundary change review process submitted a declaration in this case stating that the department has two employees whose main job is to review all preliminary and final requests from districts for approval of boundary change documents. In 2017, the final requests alone numbered 368, and the department employees achieved an average response time of nine days. The number of requests appears to increase substantially as the annual March 31 deadline approaches; a total of 189 preliminary and final requests arrived during the two-month period of February and March 2018.

department's role. In the development of ORS 308.225, the most relevant changes came about through Senate Bill (SB) 683, adopted as Oregon Laws 1975, chapter 595.[7] SB 683 for the first time mentioned the department and assigned to it materially the same tasks as under today's law. As adopted, subsection (2) provided in relevant part:

> "Whenever a boundary change is made or proposed, the person, governing body, officer, administrative agency or court making the determination[8] that the boundary change is final shall file with the county assessor *and the Department of Revenue* the legal description of the boundary change or proposed change and an accurate map showing the change or proposed change in final approved form, prior to the next March 31."

ORS 308.225(2) (1975), *amended by* Or Laws 2010, ch 29, § 1 (emphasis added). Prior versions of the statute, dating to 1915, referred only to the county assessor. The legislative record indicates that the main reason to involve the department was to centralize, and to improve the quality and consistency of, the legal descriptions and maps used for property tax purposes throughout the state. A department representative testified to the revenue committees in both chambers that the bill "pertains to developing in the Department of Revenue a central inventory of all taxing districts, from which we would maintain a set of tax code maps for the entire state of Oregon."  Testimony, Senate Committee on Revenue, SB 683, Apr 2, 1975 (statement of Don Fisher, Department of Revenue); Testimony, House Committee on Revenue, SB 683, May 28, 1975, Ex A (written statement of Don Fisher, Department of Revenue). The department foresaw multiple uses for this central repository, ranging from planning and zoning to industry research and economic development. *Id.* The department

---

[7] The department's opening brief helpfully summarizes the 100-year evolution of ORS 308.225 and its predecessors.

[8] A 2010 amendment created today's reference to the "person, governing body, officer, administrative agency or court that is or will be responsible for determining whether the boundary change is final," apparently without any intention of making a substantive change. *See* Or Laws 2010, ch 29, § 1 (Spec Sess) (deleting "making the determination that" immediately before the phrase "the boundary change is final" and inserting in its stead "that is or will be responsible for determining whether").

also sought to "upgrad[e] the standard of tax district boundaries" by requiring outside review by the department or an engineer, in order to meet such basic goals as ensuring that each boundary description actually "closes," meaning that the line defined by the legal description ends at the same point where it began, thus drawing a closed shape. *Id*; *see generally Rath v. Haycock*, 137 Or App 456, 463, 905 P2d 854 (1995) (discussing legal descriptions that fail to close). The department wanted to counteract recurring problems such as "where whole areas of a county have been left out of a taxing district," or "properties have been sited * * * in the wrong taxing district" because of an incorrect metes and bounds description. *Id.* The department was keen to use its new "plotter-digitizer" instrument to maintain the maps, and to tie Oregon to the "coming thing," namely a new mapping system based on a nationally standardized "coordinate grid system" as opposed to the old "Willamette Base Meridian." *Id.* at 2-3.

Then-Senator Victor Atiyeh, whose district was in the Portland area, asked the department's representative, Don Fisher, in an April 2, 1975, hearing in the Senate Revenue Committee, about the department's role in "approving" boundary changes. Also present was Richard Van Orman, director of the Marion-Polk County Local Government Boundary Commission. The as-introduced version of SB 683 would have added a new subsection (5) to ORS 308.225 reading as follows: "If not certified [by a registered land surveyor or a registered engineer] as provided in subsection (7) of this section, each description and map filed under subsection (2) of this section shall be examined by the Department of Revenue *and approved or disapproved* within 30 days of receipt." SB 683 (1975) (emphasis added). This proposed language, in which the department's approval role is materially the same as in current ORS 308.225(6), prompted the following colloquy:

"[Senator Atiyeh:]   Looking now at subsection (5), page 3. 'If not certified' and so forth. The 'approval shall not be made unless'—now approval of whom, the Department of Revenue?

"[Don Fisher:]   Approval by the Department of Revenue of the annexation.

"[Atiyeh:]    How come you get to approve of the annexation?

"[Fisher:]    Well, approval of whether the survey really closes is what we're after. Does the survey really close. Uh, Senator, we don't have problems with the *big* counties, where the boundary commissions are. Our problems are with the counties that don't have boundary commissions or don't have staff—.

"[Atiyeh:]    People who live in counties with boundary commissions have problems, but they don't relate to mapping. Uh, well I'm still trying to get at—subsection (5)—I want to read it directly * * *. Now are you approving the map, or are you approving the boundaries? Are you approving the way the map was done?

"[Fisher:]    That is right.

"[Atiyeh:]    Or are you approving the boundaries?

"[Fisher:]    We're approving, in effect the boundaries, as to whether the description they have really closes.

"[Atiyeh:]    Well, I understand that but * * * where I am right now is: a governing body wants to annex a [unintelligible] or create a new one. And they—some counties have to go through a boundary commission who has to approve. But where I am is: do you *also* have to approve?

"[Fisher:]    We would not, and this is a concern that the boundary commission, Ken Martin, had and Mr. Van Orman also: and we're not going to veto actions of a boundary commission. We would change the words so that this would not be a possibility.

"[Atiyeh:]    Oh, you're talking about technical aspects of that.

"[Fisher:]    That is right. We have no concern on having a veto power, or a second review authority, over the local boundary commission or any local annexation. All we want to do is make sure that it's *technically* sound and that it makes sense when you put it on a map. And the law provides there that if a local land surveyor does not make this description so it closes, then they must get this in to us by February 15, and by five days later we must return it to the districts, telling them what is wrong with it so they can still have the full 30 days to get it in by March 31."

Tape Recording, Senate Committee on Revenue, SB 683, Apr 2, 1975, Tape 9, Side 2 (emphases added).

The court concludes that this legislative history strongly supports the city's position and does not support the department's position. Senator Atiyeh's line of questioning went directly to whether the bill would give the department a substantive role similar to that of a regional boundary commission, a recently created unit of state government whose approval was required before a local government could proceed with a boundary change.[9] When Fisher initially stated that the department would be approving any "annexation," Senator Atiyeh immediately asked, "How come you get to approve the annexation?" Senator Atiyeh persisted and was satisfied only when Fisher assured him that the department did not want to have a veto power or to serve as a second review authority, but only to ensure that the legal description "closes" (begins and ends at the same physical point) and "makes sense when you put it on a map." The department further assured Senator Atiyeh that it had negotiated with Van Orman and others to develop an amendment to the bill that would eliminate any possibility of such a veto.

Three weeks later, on April 25, 1975, the same committee amended SB 683, adopting, among other changes, the text that is now subsection (8):

"The filing of the description and map under this section is for assessment and taxation purposes only and does not affect or relate to filing for any other purpose."

See SB 683 A-Eng (1975); Senate Amendments to SB 683, Apr 25, 1975. The amendments passed without discussion of subsection (8). Van Orman again was present, and Senator Atiyeh was the one who moved to pass the amendments. Tape Recording, Senate Committee on Revenue, SB 683, Apr 14, 1975, Tape 11, Side 1.

---

[9] At the time of the dialogue, three statutorily created boundary commissions covered the state's largest population centers, including the Portland area. Within the territory of a boundary commission, a local government seeking to effect a boundary change was required to submit its local resolution or order to the boundary commission. See former ORS 199.465(1) ("major" boundary changes), ORS 199.490(3)(e) ("minor" boundary changes) (1973). In the case of a "major" boundary change, further proceedings at the local government level were suspended during the boundary commission's review, up to a maximum of 120 days. See former ORS 199.465(2), (3) (1973). Any "minor" boundary change was required to commence directly with the boundary commission. See former ORS 199.490(3)(e) (1973).

The parties differ in their interpretation of subsection (8). The city claims that subsection (8) bars the department from questioning the authority of a filer because to do so would allow the department to "invalidat[e] the municipal ordinance that approved the description and map." The department argues that subsection (8) means precisely the opposite: that the department has license to reject the city's boundary change under municipal law because subsection (8) transforms any determination the department might make in the course of an approval or rejection into a determination inherently limited to taxation. In essence, the department claims that the legislature intended subsection (8) not to limit the department's ability to act, but rather to define away the possibility that the department's actions could have consequences other than tax consequences.

The court has found no testimony or other legislative history on the meaning of subsection (8). However, a review of the text and context of that provision, in light of the context and legislative history discussed above, supports the city's argument that the legislature did not intend that the department analyze the substantive authority of the filer of a legal description and map of a boundary change because the department's limited role under ORS 308.225 does not include substantively approving the change.[10] Like subsection (2)(a), subsection (8) is directed *to filers*, not to the department. The first of subsection (8)'s two clauses declares that the filing of the map and legal description with the department is for assessment and taxation purposes only. The court interprets this clause as simple notice to a filer that it should expect tax consequences to follow when the filer submits the map and legal description of a boundary change to the department.

The second clause, along with the word "only" in the first clause, declares that the filing of the description and map with the department and the assessor has no effect on a

---

[10] The Court of Appeals reached the same general conclusion in response to a litigant who argued that the department's approval of a map and legal description under ORS 308.225 prevented the court from reviewing the propriety of a boundary change. *See City of Damascus v. Brown*, 266 Or App 416, 437-39, 337 P3d 1019 (2014). The court held that the department "plays no role in 'approving' the withdrawal itself." *Id.* at 438.

*filing* for any other purpose. The court interprets the second clause broadly, to mean that the filing with the department does not supplant or preclude a filing (or a dispute or a debate) in any other forum, whether legal or political, related to the validity or desirability of the boundary change. This interpretation is based in part on the context supplied by boundary change statutes in place in 1975, which required filings with multiple state and local bodies. *Former* ORS 198.780 (1973), like its current counterpart, required a county board that entered an order of formation, annexation, withdrawal, merger, consolidation, or dissolution[11] to file duplicate copies of the order not only with the department, but also with the Secretary of State, the county clerk, and the county assessor.[12] By amending ORS 308.225 to include subsection (8), the legislature emphasized that each recipient had a different role and a different reason for receiving the filing. Under subsection (8), a filer could not expect its filing with one body to "count" as a filing with another.

A closer look at the statutory context at the time also reveals no basis to conclude that the legislature intended the amendment that produced subsection (8) to authorize the department to do more than check the accuracy of the legal description and map. For example, another statute, *former* ORS 198.785(2) (1973), already provided three separate means to "contest the validity" of a boundary change involving a special district: a mandamus action in circuit court, a special *in rem* proceeding in circuit court or a writ of review. *See former* ORS 198.785(3) (1973) (referring to *former* ORS 33.710‑33.720 and *former* ORS 34.010‑34.100) (1973)). For other boundary changes, the Uniform Declaratory Judgments Act then, as now, allowed an interested person to seek a determination in a court of record of the "validity" of a "municipal *** ordinance." *Former* ORS 28.020 (1973). The department in this case resists the notion that it seeks to invalidate the city's Ordinance 522. But the question of whether the city's boundary change request was "filed with the Department 'by the person, governing body, officer, administrative agency or

---

[11] These are essentially the same events that constitute a "boundary change" under ORS 308.225. *See also former* ORS 308.225 (1973) (same).

[12] *Former* ORS 198.785(2) applied to formation of a district or to a "change of organization," defined to include the withdrawal of territory from a district or an annexation, merger, consolidation, or dissolution. *See former* ORS 198.705(5) (1975).

court that is or will be responsible for determining whether the boundary change is final' as required by ORS 308.225 (2)(a)" is completely coextensive with the question of Ordinance 522's validity for any other purpose.

The department's interpretation in this case seems directly contrary to its representative's testimony in 1975 that "[w]e have no concern on having a veto power, or a second review authority, over the local boundary commission or any local annexation. All we want to do is make sure that it's *technically* sound and that it makes sense when you put it on a map." The court cannot square Don Fisher's plainspoken assurance in 1975 with the department's argument today that subsection (8) authorizes the department to undertake a substantial legal analysis second-guessing the local government filer's authority to effect the boundary change in the first place.

4.  *Effect of ORS 306.115(1)*

ORS 306.115(1) requires the department to supervise and control the property tax system and authorizes the department to "do any act or give any order to any public officer" it deems necessary to conform the taxation of property to statute. The county asserts that this general grant of authority allows the department to investigate the authority of a filer under ORS 308.225. The department, too, relies on ORS 306.115(1), but for the more nuanced position that the statute authorizes it to correct its March 7, 2018, approval of the map and legal description. The court must now consider whether the department's supervisory authority undoes the restrictions that the court finds in subsection (8) of ORS 308.225.

The department, including its predecessor the State Tax Commission, has had extensive supervisory powers since it was formed in 1909.[13] Charged with a

---

[13] Oregon Laws 1909, chapter 218, created the Board of State Tax Commissioners, with the duty to "exercise general supervision of the system of taxation *** throughout the State ***," and to "require all assessments of property in this State *** be made according to law." Or Laws 1909, ch 218, § 4. In 1929, the legislature added the authority "to do and perform any act, to give any order or direction to any *** county assessor as to the valuation of any property, or class or classes of property, *** to the end that all taxable property in this state shall be listed upon the assessment rolls and valued and assessed according to the provisions of law ***." Or Laws 1929, ch 465, § 1.

wide-ranging and heavy responsibility, the department has consistently claimed broad powers in order to discharge that responsibility effectively. The courts generally have upheld the department's exercise of its supervisory authority. *E.g., Weyerhaeuser Timber Co. v. Tax Com.*, 223 Or 280, 355 P2d 615 (1960) (approving Commission's interpretation of "area" as entire county for purposes of valuing standing timber, notwithstanding county assessor's and taxpayer's preference for smaller areas that arguably reflected market value more accurately); *Balderee v. Commission*, 2 OTR 142 (1965) (approving commission's exercise of supervisory authority to raise beachfront property values in 150 cases upon request of assessor although assessor could have appealed the cases individually); *but see Domogalla et al v. Dept. of Rev.*, 7 OTR 242, 245-46 (1977), *aff'd*, 283 Or 377, 584 P2d 256 (1978) (describing department's supervisory authority as "extremely broad and sweeping" but declining to allow department to use it to override and reduce assessor's valuation of taxable state parking lot in Salem).

At the time of the 1975 hearings on SB 683, the relevant provisions read:

> "The Department of Revenue shall exercise general supervision of the system of taxation throughout the state, and general supervision and control over the administration of the assessment and tax laws and over county assessors and county boards of equalization in the performance of their duties relating to taxation to the end that all taxable property is assessed uniformly according to law and equality of taxation according to law is secured."

*Former* ORS 305.090 (1973) (emphasis added).

> "*The Department of Revenue may do any act or give any order* to any county board of equalization or county assessor as to the valuation of any property or class of property which the department deems necessary *so that all taxable property is assessed according to law* and equalized between taxpayers, between counties and between taxing units to the end that equality of taxation according to law shall be secured."

*Former* ORS 306.111 (1973) (emphases added). These two provisions had been materially unchanged since at least 1953. The court is required to presume that the 1975 legislature was aware of these provisions. *Moro v. State of Oregon*, 354 Or 657, 665-66, 320 P3d 539 (2014) (court presumes that the legislature is aware of existing law and Oregon Supreme Court's interpretation of that law). The court therefore concludes that the legislature enacted subsection (8) of ORS 308.225 as a specific limitation that the department is required to follow notwithstanding the broad supervisory powers previously delegated.

The question then becomes whether the legislature has, since 1975, adopted legislation expanding the department's supervisory powers in a way that overrides the limitations of subsection (8). The only material changes to the foregoing provisions occurred in 1983, when the legislature in Senate Bill 68 "consolidate[d]"[14] them into what is now subsection (1) of ORS 306.115. Or Laws 1983, ch 605, § 1. The text of SB 68 shows that subsection (1) of ORS 306.115, as enacted in 1983, incorporates the same preexisting key phrases that broadly delegate supervisory authority, as emphasized below:

> "The Department of Revenue shall exercise general supervision and control over the system of property taxation throughout the state. The department may do any act or give any order to any public officer or employee that the department deems necessary in the administration of the property tax laws so that all properties are taxed or are exempted from taxation according to the statutes and Constitutions of the State of Oregon and of the United States. Among other acts or orders deemed necessary by the department in exercising its supervisory powers, the department may order the correction of clerical errors, errors in valuation or the correction of any other kind of error or omission in an assessment or tax roll as provided under subsections (2) to (4) of this section."

*Former* ORS 306.115(1) (1983). The legislative history of SB 68 shows that nearly all of the legislature's attention was focused on the remaining subsections that became ORS 306.115(2)

---

[14] The editor's summary of all versions of SB 68, from introduction to enrollment, states: "Consolidates provisions for department's supervisory authority." *See* SB 68 (1983) (as introduced, A-engrossed, enrolled).

through (5). Those latter subsections implement[15] the general grant of authority by providing specific mechanisms for the department to change or correct the tax roll in instances involving either property of the same class or in the same area (subsection (2)) or—much more commonly—individual parcels whose owners failed to pursue the usual appeal avenues (subsection (3)). Department representatives testified that recent court decisions had interpreted existing law as *requiring* the department to give supervisory review to any taxpayer that requested it, enabling taxpayers to bypass the regular property tax appeal process that at that time commenced with the local board of equalization. Tape Recordings, Senate Committee on Revenue, SB 68, Mar 7, 1983, Tapes 48, 49, Side A and B; Mar 10, 1983, Tape 51, Side A; Mar 22, 1983, Tape 61, Side A and B, Tape 62, Side A; Tape Recording, House Committee on Revenue and School Finance, SB 68, July 6, 1983, Tape 333, Side A and B. Department representatives and county assessors cautioned that they anticipated a dramatic increase in supervisory review applications, which would place new cost burdens on the department and assessors. Testimony, SB 68, Mar 22, 1983, Tape 62, Side A (statements of Don Mason, Director of Assessment and Taxation, Washington County, and Bill Bain, Oregon Association of County Assessors). Over the course of several hearings, Senate Revenue Committee members worked to find a way to generally compel taxpayers to use the regular appeal process, while preserving specific *discretionary* authority in the department to adjust the tax roll regardless of whether the taxpayer had pursued the regular appeal route.

Although Senate Revenue Committee members and staff revised subsections (2) through (5) of ORS 306.115 more than once, they left the text of subsection (1) nearly unchanged from the date of its introduction.[16] They did

---

[15] This court has described former specific appeal provisions as "implementing" the general grants of supervisory authority. *See Domogalla et al v. Dept. of Rev.*, 7 OTR 242, 246 (1977), *aff'd*, 283 Or 377, 584 P2d 256 (1978).

[16] An amendment to subsection (1) changed the reference to state law (from "according to the statutes and constitution of the state" to "according to the statutes and Constitutions of the State of Oregon and of the United States"). The amendment also clarified that the changes or corrections in subsections (2) through (5) are "[a]mong other acts or orders deemed necessary by the department." *Compare* SB 68 as introduced *with* SB 68 as enrolled.

however, question the department's representatives about subsection (1) in their first hearing, on March 7, 1983. One senator asked the department's attorney, Ted de Looze: "In combining these three sections into one have you in any way changed the appeals process? Just by combining? Are there any other changes other than the one we're talking about?" Tape Recording, Senate Committee on Revenue, SB 68, Mar 7, 1983, Tape 49, Side A. De Looze responded by pointing out that subsection (1) added a duty to ensure that properties are "exempted from taxation" according to state law, not merely "taxed" according to state law. *Id.* De Looze also stated that the former reference to "law" or "the assessment and tax laws" was "spelled out" to refer instead to "the statutes and Constitutions of the State of Oregon and of the United States." *Id.* Finally, De Looze noted that the new language of subsection (1) referred to the department's authority over the system of "property" taxation, adding the word "property" to avoid any inference that the department could conduct supervisory review hearings in income tax cases. *Id.* SB 68, including Senate amendments to subsections (2) through (5), passed the House after one hearing without any substantive discussion of subsection (1). Minutes, House Committee on Revenue and School Finance, July 6, 1983; Tape Recording, Senate Committee on Revenue, SB 68, July 6, 1983, Tape 333, Side A. No one in either chamber discussed ORS 308.225. The court concludes that the legislature did not intend to change its prior limitation on the scope of the department's review under ORS 308.225(8).

5.   *Conclusion on First and Fourth Issues*

The court recognizes that ORS 308.225 puts the department in an awkward position with respect to boundary changes, which often are a matter of controversy and high public scrutiny. On the one hand, if the department questions the authority of a filer that is a public body, as it has done here, it stands to be accused of overreaching. But if the department limits the scope of its review to the accuracy of a map and legal description, it risks being accused of contributing to incorrect taxation in dereliction of its general duty to supervise the property tax system. A clearer expression of legislative policy might be in the public interest for future cases, such as the department's "rogue taxpayer"

scenario, but the court concludes that the existing text, context, and legislative history make the answer quite clear for this specific case.

The court concludes that the legislature had no intention to cause the department to review the authority of a local government filing a boundary change; the legislature's sole concern was to deploy the "technical" expertise of the department to ensure the internal accuracy of legal descriptions and maps of boundary changes. In crafting ORS 308.225, the legislature appears not to have focused on the specific possibility of a dispute over the validity of a change submitted by a local government, including the risk that two jurisdictions might each claim the right to levy tax on the same property for the same purpose.[17] However, Senator Atiyeh's comments clearly reflect an understanding that such a change is governed by public processes in which the department does not, and should not, participate. The testimony of Don Fisher linked those comments to a forthcoming amendment to SB 683 that Senator Atiyeh himself later voted to approve, and that the entire legislature later passed as amended.[18]

Regarding the fourth issue, the court concludes further that the limit on the department's role under ORS 308.225 extends to its authority to revoke its approval of the map and legal description solely on the basis of its legal conclusion that the city lacked authority to withdraw

---

[17] Although tax collections based on erroneous factual or legal predicates are regrettable and no doubt costly to correct, the legislature has provided mechanisms to address them. Once the underlying issue has been decided, the department, acting on its own or pursuant to the direction of a court can require the assessor or assessors involved to correct the tax roll. *See* ORS 311.205 (1)(d). Any additional taxes due are collected by adding them to the next annual tax statements sent to affected property owners. ORS 311.206(1)(a). Likewise in the case of an overcollection of tax, ORS 311.806 authorizes a county to issue a refund. A specific provision governs overcollected amounts that arise when the property later is determined not to have been within the jurisdiction of the tax levying body. S*ee* ORS 311.806(1)(e).

[18] The legislature in enacting SB 683 appears to have spent no time at all on the "rogue taxpayer" problem that the department here posits, and the city in this case seemed to acknowledge in oral argument the possibility that the department could reject a facially absurd filing. Although the issue appears not to have arisen in the 40-some years since the legislature enacted SB 683, the legislature might well choose to address for the future how to deal with clearly unauthorized boundary change filings.

from the district. Allowing the department to revoke its approval as part of the process under ORS 308.225 would violate legislative intent to the same extent as an initial disapproval.

The court does not lightly conclude that the department's supervisory authority is restricted, given the broad and longstanding language now codified in ORS 306.115(1). However, based on the foregoing analysis, including the unusually specific representations of Don Fisher in the course of a dialogue directly addressing the scope of the department's authority, the court must defer to the legislature's intention in enacting the specific provisions in ORS 308.225. *See* ORS 174.020. Nor does the court hold that the department is precluded from undertaking the analysis of the city's authority at all, or that the department is precluded from discharging its responsibility to conform the taxation of property to Oregon law in other ways. The court sees nothing that would have prevented the department from initiating a judicial action in an appropriate court to determine the validity of the city's withdrawal, or that would have prevented the department from urging the assessor to do so. As of the date of this order, the department also has the ability to seek to intervene in Circuit Court Cases 1 or 2, or both.

B.   *Remaining Issues*

The court's decision above on the scope of the department's authority and the court's order below make it unnecessary to address the second and third issues, namely the court's jurisdiction to review the department's substantive determination of the validity of the city's purported withdrawal[19] and the validity of that determination.

---

[19] Early in this case, the court expressed to the parties its concerns that any decision by this court on the validity of the city's withdrawal may have "substantial non-tax consequences" precluding jurisdiction in this court. At the court's request, the parties briefed jurisdictional issues, including the consequences of potential "split jurisdiction" between this court and the circuit court in violation of the Supreme Court's direction in *Sanok v. Grimes*, 294 Or 684, 697, 662 P2d 693, 701 (1983). The court continues to have concerns and notes as an update that the recent filings in Circuit Court Cases 1 and 2 make clear that, if this court were to weigh in on the validity of the city's withdrawal "for tax purposes," it would need to apply the same sets of municipal laws that the county already has asked the circuit court to apply for purposes of the claims in those cases.

## V.  CONCLUSION

The court concludes that the department has not shown cause why it has refused to comply with the Amended Alternative Writ of Mandamus. The record makes clear that the department's sole basis for rescinding on June 19, 2018, its March 7, 2018, notice approving the legal description and map was the department's conclusion that the county's governing board, rather than the city, should have filed any legal description or map of the boundary change. Accordingly, nullifying the June 19 rescission and reinstating the March 7 approval notice will provide an adequate remedy for the city. Now, therefore,

IT IS HEREBY ORDERED:

(1) That Relator's Motion for Summary Judgment is granted;

(2) That Defendants' Motion for Summary Judgment is denied;

(3) That Defendants-Intervenors' Motion for Summary Judgment is denied;

(4) That the department's rescission dated June 19, 2018, of its approval in boundary change matter #322292018 is hereby declared null and void; and

(5) That the department's March 7, 2018, notice of approval in the same matter is reinstated.

# APPENDIX A

## ORS 308.225

### Procedure for Boundary Changes:

"(1)   In preparing the assessment roll in any year, a county assessor shall disregard changes or proposed changes described in subsections (3), (4) and (5) of this section in the boundary lines of any taxing district levying ad valorem property taxes if the description and map showing changes or proposed changes are not filed in final approved form, in accordance with and at the time required by subsection (2) of this section.

"(2)(a)   If a boundary change is made or proposed, the person, governing body, officer, administrative agency or court that is or will be responsible for determining whether the boundary change is final shall file with the county assessor and the Department of Revenue the legal description of the change or proposed change and an accurate map showing the change or proposed change in final approved form, on or before March 31 of the assessment year to which the boundary change applies.

"(b)(A)   Except as otherwise provided in subparagraph (B) of this paragraph, the legal description of the boundary change must consist of a series of courses in which the first course starts at a point of beginning and the final course ends at the point of beginning. Each course must be identified by bearings and distances and, when available, refer to deed lines, deed corners and other monuments, or, in lieu of bearings and distances, be identified by reference to:

"(i)   Township, range, section or section subdivision lines of the United States Public Land Survey System.

"(ii)   Survey center line or right of way lines of public roads, streets or highways.

"(iii)   Ordinary high water or ordinary low water of tidal lands.

"(iv)   Right of way lines of railroads.

"(v)   Any line identified on the plat of any recorded subdivision defined in ORS 92.010.

"(vi)   Donation land claims.

"(vii)   Line of ordinary high water and line of ordinary low water of rivers and streams, as defined in ORS 274.005, or the thread of rivers and streams.

"(B)   In lieu of the requirements of subparagraph (A) of this paragraph, boundary change areas conforming to areas of the United States Public Land Survey System may be described by township, section, quarter-section or quarter-quarter section, or if the areas conform to subdivision lots and blocks, may be described by lot and block description.

"(c)   The county assessor or the department shall provide a map to the person, body, officer or agency making the filing within 14 days after the filing body notifies the assessor and department that a boundary change is being proposed. Upon receipt, the filing body shall accurately enter the boundary line on the map.

"(d)   The description and map must be filed in final approved form on or before March 31 of the assessment year to which the boundary change applies. Proposed changes must be certified to the county assessor and the department in the same manner as changes. If the taxing district is located in more than one county, the description and map shall be filed with the assessor in each county and with the department within the time provided in this subsection.

"(3)   For purposes of this section, boundary change means the change that occurs in the boundaries of a district by reason of:

"(a)   The formation of a new district;

"(b)   The consolidation or merger of two or more districts or parts thereof;

"(c)   The annexation of territory by a district;

"(d)   The withdrawal of territory from a district; or

"(e)   The dissolution of a district.

"(4)   For purposes of this section, the establishment of tax zones within a district constitutes a boundary change.

"(5)   For purposes of this section, a proposed change means a boundary change that has not become final or effective on or before March 31 and that:

"(a)   Is certain to become final or effective before July 1 of the same year; or

"(b)   Is subject to voter approval in an election held before July 1 of the same year and that becomes final or effective before July 1 of the same year.

"(6)   Each description and map filed under subsection (2) of this section shall be submitted to the Department of Revenue and approved or disapproved within 30 days of receipt.

"(7)   Within five days of its determination, the Department of Revenue shall provide notice of its approval or disapproval under subsection (6) of this section to each county assessor with whom a filing has been made and to the filing body. If the description or map is disapproved, the department shall explain what steps must be taken to correct the description or map, and shall cooperate with the filing body in helping it meet the requirements of this section, and whenever possible, the filing deadline of March 31. Corrected descriptions and maps must then be resubmitted to the department, and approved, and filed with the assessor or assessors.

"(8)   The filing of the description and map under this section is for assessment and taxation purposes only and does not affect or relate to filing for any other purpose."